**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael E. QUINTO,
Defendant-Appellant.**

**No. 914, Docket 78–1027.**

United States Court of Appeals,
Second Circuit.

Argued May 9, 1978.

Decided Aug. 7, 1978.

226

Frederic Block, Smithtown, N. Y., Hull, Block & Grundfast, Smithtown, N. Y., for defendant-appellant.

Mary McGowan Davis, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before WATERMAN, INGRAHAM * and MANSFIELD, Circuit Judges.

WATERMAN, Circuit Judge:

While it is superfluous to say that the intent of a tax evader is to try "to screw the government out of some cash if [he can]," what makes this contested tax evasion case remarkable is that, according to the government, Quinto, the alleged tax evader here, was gracious enough to acknowledge to two Internal Revenue Service agents when interviewed by them that that is precisely what he was hoping to accomplish by failing to report approximately $15,000 of income over a two-year period. Not surprisingly, though, Quinto's recollection of his interview with the IRS agents, as developed during his testimony in his own defense at his trial before Judge Pratt and a jury in the United States District Court for the Eastern District of New York on two charges of tax evasion (26 U.S.C. § 7201) and two charges of willfully subscribing false income tax returns (26 U.S.C. § 7206(1)), is somewhat different.

The legal issue which we are required to resolve on this appeal from Quinto's conviction on all counts of the four-count indictment brought against him was precipitated by the government's unwillingness to rely solely upon the revenue agents' in-court testimony regarding their interview. More particularly, to rehabilitate one agent's damaged credibility and further to prove that Quinto had indeed made certain extremely incriminatory remarks to his in-quisitors, the government sought to introduce, and, after initial refusals by the judge, was permitted to introduce an elaborate IRS memorandum recounting in extraordinary detail what had purportedly transpired during Quinto's interrogation by the IRS agents and two federal prosecutors. Inasmuch as we agree with Quinto that the district court erred by admitting the memorandum as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B) and that the court's erroneous admission of the document severely prejudiced Quinto's right to a fair trial, we reverse the judgment order of conviction and remand for a new trial on all counts of the indictment.

The four-count indictment upon which Quinto was prosecuted charged him with two counts of income tax evasion, in violation of 26 U.S.C. § 7201, for the calendar years 1974 and 1975, and with two counts of willfully subscribing false income tax returns, in violation of 26 U.S.C. § 7206(1), for those same two years. Following a six-day jury trial in the United States District Court for the Eastern District of New York, Quinto was convicted on all four counts. Upon his four convictions, Quinto was sentenced to a two-year term of imprisonment on each count, the sentences to be served concurrently with two months of each two-year term to be served in a "jail-type" institution. Quinto was also fined $2,500 on each of the four convictions, the total of the fines so imposed being $10,000. Execution of sentence was stayed and Quinto has been free on bail pending disposition of this appeal.

Michael Quinto is a full-time employee of the Suffolk County (New York) Land Management Bureau, serving in the capacity of Senior Right of Way Agent. Since 1965, however, Quinto had also performed services on a part-time basis for the architectural and engineering firm of Wiedersum Associates. Because of Quinto's numerous business and personal contacts with school board members throughout Suffolk County, Wiedersum had retained him as a "public relations man or sales representative" who might be able to arrange interviews for the

* Of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

firm with Suffolk County school boards interested in obtaining architectural or engineering services of the type provided by Wiedersum. Quinto's arrangement with Wiedersum provided that if, as a result of the interviews Quinto arranged, the firm were selected to perform professional services for a school district, Quinto's compensation would amount to 4½–5% of Wiedersum's gross architectural fee. It was understood, however, that, as a general matter, Quinto would not be reimbursed by Wiedersum for any of the business expenses he might incur while performing services for Wiedersum. Beginning in 1965 Quinto received $50 per week from Wiedersum as an advance against the commissions it was expected he would earn and in 1966 the size of the weekly advance was increased to $100 per week. Quinto continued to receive these weekly payments until 1975. Moreover, the firm would also occasionally make lump-sum payments to Quinto to cover commissions he had earned.

As a result of Quinto's successful public relations efforts, Wiedersum paid Quinto over $75,000 and on his federal income tax returns for the years 1965–1973 Quinto carefully reported as gross income all these amounts so received from Wiedersum. Quinto's troubles with the Internal Revenue Service, however, developed out of his failure to report on his 1974 and 1975 federal income tax returns any income he received from Wiedersum during those years. It is conceded that Wiedersum paid Quinto $10,400 (composed of $5,400 in weekly checks and a $5,000 lump-sum payment) in 1974 and $5,300 (all in weekly payments) in 1975. Quinto did not report any of this income, and he did not claim any business expenses which he might have incurred through his employment by Wiedersum. According to the testimony of an IRS official, as a result of Quinto's failure to report the payments received from Wiedersum in 1974 and 1975 Quinto underpaid his federal income tax by approximately $3,300 in 1974 and by $1,950 in 1975.

Inasmuch as the defense acknowledged that Quinto had failed to report the aggregate $15,700 received from Wiedersum during 1974 and 1975, the government's proof at trial was directed at establishing that at the time he had failed to report the income Quinto had had the willful intent that must exist for a defendant to be convicted of tax evasion (§ 7201) and of willfully subscribing false income tax returns (§ 7206(1)). To establish the willfulness of Quinto's failure to report income, the government relied upon the testimony of James Wallwork, a Special Agent in the Intelligence Division of the Internal Revenue Service. The crucial portion of the agent's testimony concerned an interview with Quinto conducted by Wallwork, Peter Fuhrman, another IRS Special Agent, and two Assistant United States Attorneys. Several days prior to August 20, 1976, the date on which the interview was conducted, a federal prosecutor had called Quinto and asked him to appear for the interview at the prosecutor's office in the United States Courthouse in Brooklyn. At the time the invitation was extended, the agents and the prosecutor were fully aware that Quinto had not reported the $15,700 he had received from Wiedersum during 1974 and 1975. Unaccompanied by counsel, Quinto appeared at the scheduled time and was ushered into the prosecutor's office. Wallwork testified at trial that, prior to the start of the interrogation, one of the two prosecutors who was present advised Quinto that he was a target of a grand jury investigation and that he was also a subject of a criminal investigation by the Internal Revenue Service. Miranda warnings were also given, and these were repeated several times during the course of the interview. After the initial warnings had been given, Quinto claimed to understand his rights and expressed his desire to proceed with the discussion. Quinto was eventually asked why he had not reported the money he had received from Wiedersum during 1974 and 1975, and according to Wallwork, Quinto, after some abortive attempts to extricate himself from his obvious predicament, blurted out: "Okay, I was trying to screw the government out of some cash if I could."

Defense counsel conducted a vigorous cross-examination of Wallwork which was designed to show that the meeting of Au-

gust 20 had been more of an inquisition than an interview and that subsequent to that interview the IRS had failed to conduct an adequate enough investigation for the purpose of corroborating Quinto's story that he had had various unreported business expenses, attributable primarily to Quinto's entertainment of members of local school boards, which would counterbalance any unreported income.[1] On Agent Wallwork's

1. As Judge Pratt correctly explained to the jury, the existence of these unreported business expenses, if they were of sufficient magnitude, might have been a complete defense to the tax evasion (§ 7201) charges.

Now, let us discuss each of the three elements of the tax evasion charges. With respect to the first element, that there be a substantial tax due and owing, the Government must prove that the Defendant had taxable income which he failed to report on his tax return, and that had he reported such income, there would have been a substantial additional tax due and owing to the United States.

Taxable income is what remains after all lawful exemptions and deductions are subtracted from gross income. Here, there is no dispute that the monies received from Wiedersum Associates in 1974 and 1975 were part of his gross income. The issue for you to determine, therefore, in deciding whether there was in fact a taxable income which Defendant failed to report, is whether there were, as Defendant claims, unreported business expense deductions equal to or in excess of the gross income from Wiedersum in that year. If you find that there was a taxable income which was not reported, then you must also determine whether the amount of the additional tax due on that additional taxable income was substantial.

Much of the testimony you have heard has been directed to the question of alleged business expense deductions. How should you go about evaluating that evidence? To begin with, keep in mind that it is the Government's burden to prove beyond a reasonable doubt the basic element, that there was a substantial additional tax due and owing. To prove this, the Government presented evidence and the Defendant admitted that he had received some $10,000 of unreported income in 1974, and some $5,000 in 1975. At that point the law requires the Defendant, if he claims offsetting business expense deductions to come forward with evidence establishing his entitlement to those deductions. The Defendant here has attempted to present such evidence which the Government challenges both as to whether legitimate business expenses were actually incurred, and if so, as to the amount of those expenses.

You have heard the evidence and the arguments of Counsel with respect to these claimed business expense deductions. You should weigh all of that evidence and determine on the entire case whether the Government has established beyond a reasonable doubt that a substantial additional tax was in fact due.
Tr. at 1164–1166.

In contrast, as Judge Pratt carefully instructed the jury, a defense to the willful subscribing counts could not be predicated *solely* on the basis of the existence of unreported expenses, but the existence of such expenses could well serve as an important element of a defense, based upon a good faith mistake of law, aimed at establishing that the defendant had not acted willfully.

The fourth element of the crime is willfulness. Used in this connection, willfulness means a voluntary, and intentional violation of a known legal duty. It is to be distinguished from accident, inadvertence, or negligence. Mere negligence, even gross negligence, is not sufficient to constitute willfulness under the criminal law.

The making of a false return is willful if the Defendant's act was voluntary and purposeful and done with the specific intent to fail to do what he knew the law requires to be done; that is to say, with a purpose to disobey or disregard the law which requires him to file a true return disclosing to the Government facts, material to the determination of his tax liability. On the other hand, the Defendant's conduct is not willful if you find that he filed a false return because of negligence, inadvertence, accident or reckless disregard for the requirements of the law or due to his good faith misunderstanding of the requirements of the law.

As we have already discussed, you have heard considerable evidence concerning certain business expense deductions. Defendant claims he did not report those deductions in the belief that when his business expenses offset his related business income he was not obligated to report either one. Of course, we discussed before the first two counts of the indictment, those charging tax evasion. The Government must prove a substantial tax due and owing thereon and the presence or absence of the claimed business expense deduction is not only relevant in this case, but it may be critical and decisive.

In the context of Counts Three and Four, however, the evidence as to the business expense deductions is to be considered by you

redirect examination, the government attempted to prove that the IRS had carefully investigated all business expenses which Quinto claimed he had not reported and had found that these claimed expenses simply did not exist. In particular, Wallwork testified that he personally had interviewed seven local school board members whom Quinto claimed he had entertained during 1974 and 1975 and that all seven individuals, including a Mr. O'Connell and a Mr. Fingar, denied having been entertained by Quinto.

More importantly, though, the prosecution on redirect examination elicited from Wallwork that the agents had prepared a memorandum following the August 20 "interview" with Quinto. The document, consisting of eight single-spaced, typed pages, purported to describe exactly what had happened at Quinto's session with the agents. It disclosed, among other things, that Quinto had been read the rights to which Wallwork had previously referred in his direct testimony and, in what was portrayed as a verbatim quotation of Quinto's remarks, that Quinto had confessed that his purpose in failing to report the income was "to screw the government out of some cash if [he] could." Arguing that there had been "a general attack on the agent's credibility," the government attempted to introduce the memorandum as a prior consistent statement usable not only to corroborate Wallwork's in-court direct testimony but also usable under Fed.R.Evid. 801(d)(1)(B) as "substantive evidence" to prove that Quinto had made the fatal admission the IRS agents claim he made. The defense objected to the admission of the document, and, although the judge sustained the objection, he expressly left open the possibility that he might permit the document to be admitted later in the trial "if there [were] a challenge to its credibility, even the form of a contradiction."[2]

---

only in a very limited sense. First of all, it's not a defense to a charge of false reporting in violation of 7206 to show that the taxpayer had permissible business expense deductions which he also neglected to report on his tax returns. In other words, the existence of such expense deductions in amounts approximating the income that was not reported, would not eliminate the Defendant's obligation of reporting the income in question.

The extent to which you may consider the evidence of such business expense deductions, however, is on the issue of whether the Defendant in good faith believed that he had such deductions in the amounts which would approximate the income he had received, and that he also believed that if the deductions approximated the income he had no obligation to report either one. Only on this issue of the Defendant's state of mind may you consider the claimed business expense deductions in connection with the third and fourth counts of the indictment.

Tr. at 1176–78.

2. Mr. Gillen: The other objection, I think, it is put in to bolster the agent's testimony—

The Court: That is why she is offering it.

Mr. Gillen: I know that. I think it is redundant. I do not know if your Honor has noticed, I have not complained up until this point, but Mr. Marcus likes to get his point across two or three times as to every item. I like to get my point across once in a while two or three times, but not as to every single item.

The Court: I think the question before me is whether this is admissible under 801(d)(1)(b). It is offered as a statement which is consistent with the witness' testimony and is offered to rebut an expressed or implied charge against the witness of recent fabrication or improper influence or motive.

Do you think there is a claim here of recent fabrication?

Mr. Marcus: No, I think the claim is improper motive, bias.

The Court: How does this statement rebut the implied improper motive?

Mr. Marcus: He suggested that this witness should not be believed.

For example, on page 6, Quinto was then asked, "how it was possible that he had forgotten to include $10,000 on his return when in addition to the $5,000 check there were weekly payments of $100." At this point Quinto said, "okay, I was trying to screw the *Government out of some cash if I could.*"

The witness made the statement as to what he had heard during the course of the meeting. Mr. Gillen attempted to attack that statement and others that suggests that the Government had been holding back expenses, that they didn't give him credit for expenses that he had during the course of this interview, and to the extent that he said he lied, this agent shouldn't be believed. *There is a general attack on the agent's credibility. There is a prior consistent statement that does rebut that. I think it properly comes in under 801(d)(1)(b).*

It is consistent with his testimony.

Quinto testified in his own defense and his testimony covered two distinct areas. First of all, his recollection of what had transpired at his interview conducted by the IRS agents and the federal prosecutors differed materially from the version of that incident conveyed to the jury through Agent Wallwork's testimony and, importantly, the version which would eventually be conveyed to the jury through the later-admitted IRS memorandum of that interview as well. Quinto, claiming that he had been lured to the interview on the pretext that the discussions there would involve certain land condemnation procedures, stated that the interview had been conducted in inquisitorial fashion, his inquisitors "badgering" and "goading" him and calling him a "liar" at several points during the interview. Quinto stated that he had not been informed at the start of the interview that he was a target, and that he had no recollection of having been informed that he had the right to leave the room at any time, or that he could refuse to answer questions.

As to the supposed admission that he was trying "to screw the government out of some cash," Quinto testified that Agent Wallwork had distorted what Quinto had actually said:

> When they were goading me and goading me, I just said, "Do you think for one moment I would try to screw the Government out of a few dollars?" That's what I said, in just that tone, with a question mark on the end of it. (Tr. at 693.)

During Quinto's direct examination, defense counsel also attempted to establish that Quinto's failure to report income and to pay the taxes due on that income was attributable to his good faith belief that his undeclared business expenses for 1974 and 1975 exceeded his unreported income for those two years.[3] During his cross-examination, Quinto denied that he had admitted at the interview that his purpose in not reporting the income had been to "screw the government out of some cash." Un-

The Court: I do not recall anything that I interrupted as an attack on this witness' credibility—interpretation of events perhaps.

Mr. Gillen: That is correct.

The Court: But, the basic elements of what transpired, particularly as a meeting, I thus far haven't seen it. It may become relevant later on if there is contradictory testimony by someone else. At this point, I think it is nothing more than adding the majesty of the written word to what we have explored in some detail. I would sustain the objection, that is not to say that I wouldn't accept it later on, if there is a challenge to its credibility, even the form of a contradiction.

Mr. Marcus: Your Honor, during the opening, Mr. Gillen suggested that, in words or substance, that the Government hadn't given the guy a fair shake, in that they didn't give him credit for expenses which they should have. I am suggesting to the Court that there has been a broad based attack on motive, intent, integrity of not only this agent, but the Internal Revenue Service in the preparation and prosecution of this case. I am suggesting to the extent that there has been this attack, this statement certainly does rebut any motive of improper conduct on the part of the Internal Revenue Service.

The Court: It does not rebut that particular charge, assuming that the charge has any place in the case.

Mr. Marcus: I certainly concede it goes to the more generally based allegation that Mr. Gillen made at the start and has made from

time to time in connection with the cross-examination of this witness. I am simply suggesting to the extent that he has put into issue here, in his opening and in connection with the examination of this witness, the motive or intent of the United States Attorney and the Internal Revenue Service, this statement does rebut an improper motive or improper intent, and for that reason, I'd offer it.

The Court: I will sustain the objection at this point. Clearly what credibility, if any, the defendant is entitled for expenses is a question that the jury has to resolve on the first two counts of the indictment I am not sure that the Government is required to give him credit in any sense. I am not even sure in any sense that the Government is even entitled to give credit in "deductions" which haven't been claimed. I do not really see how it comes into the case. I can see it as a point of argument by Mr. Gillen. I am not sure of its relevancy. It hasn't been objected to thus far. It is too late to take it out of the case entirely. Even assuming the relevancy of the argument, I do not see that the particular exhibit tends to rebut the general claim that Quinto hasn't been given a fair shake, in terms of the investigatory aspect of the case. Tr. at 345–49.

3. *See* note 1 *supra*.

daunted by this categorical denial, the prosecutor kept pressing the witness to concede that he had made the damaging statement and, to get Quinto to retract his denial, the prosecutor attempted to "refresh the witness's recollection" by showing him the IRS memorandum and directing his attention to the point in the memorandum where it was stated that Quinto had made the admission of guilt. At this point the prosecutor again offered the IRS memorandum into evidence, and again Judge Pratt refused to admit the document.

The remainder of the defense case was presented through character witnesses and witnesses who testified in support of Quinto's story that certain business expenses he supposedly incurred during 1974 and 1975 were incurred in connection with his promotional efforts on behalf of Wiedersum. Moreover, two of the witnesses, O'Connell and Fingar, who were members of local school boards, directly contradicted portions of Wallwork's prior testimony. As already mentioned, Wallwork had testified that, during his investigation to determine whether Quinto had incurred the business expenses Quinto said he had incurred, Wallwork had visited with these particular school board members. According to Wallwork's direct testimony during the government's case-in-chief, these individuals had responded that they had not been entertained by Quinto during 1974 or 1975. During their direct testimony on Quinto's behalf at trial, however, these two school board members denied having told the IRS agents that Quinto had not entertained them during 1974 and 1975. In addition, another witness contradicted Wallwork's testimony. Wallwork had previously testified that the IRS agents had learned, contrary to what they had been told by Quinto, that Quinto's wife had purchased certain gifts from a local pharmacy at the request of her employer rather than on behalf of her husband. Testifying for the defense, however, the pharmacist from whose store Mrs. Quinto had purchased these gifts disputed Wallwork's testimony that Mrs. Quinto had purchased them at the request of her employer rather than on behalf of her husband.

After the defense had rested, the judge, of his own accord, reopened the question of the admissibility of the IRS memorandum:

The Court: A little earlier this morning, Mr. Marcus, you offered in evidence the statement of the revenue agent.

Mr. Gillen: I think that was yesterday.

The Court: It had been previously offered and I ruled upon it at that time. I believe again this morning you offered it, almost in passing, without any particular discussion of the point.

Mr. Marcus: Yes, your Honor.

The Court: I sustained the objection at the time and I have been thinking about it further, and have wondered whether you were now taking the position that the implied attack upon Mr. Wallwork's credibility as to recent fabrication or improper motive or influence or something, had been sufficiently established to warrant its admission.

Mr. Marcus: That in fact, is the basis for the offer at that time. It would seem to me that at this point, we have had almost a day of Mr. Quinto, in essence, saying that Special Agent Wallwork lied in connection with saying "He was not given his rights," saying he was or was not told he was a target, etc.

The Court: I know what he said. Just when you made the offer, you didn't say anything that rang the bell that you were reasserting the argument, which you had previously made, and *which I expressly left open in the event the contradictions should occur.*

You did intend to reassert that—

Mr. Marcus: That is correct, your Honor.

The Court: I will reflect on the matter over lunch. I will give you my ruling after lunch.

Tr. at 852–53 (emphasis supplied).

After lunch, the judge did exactly that, ruling that "I have decided that I will admit [the memorandum] into evidence under 801(d)(1)(2) [*sic*], I believe it is." *Id.* at 870. Thereafter, the prosecutor distributed the

memorandum, now an exhibit in the case, to the jurors and it was taken by them into the jury room when they retired to deliberate Quinto's fate.

Quinto's principal argument on appeal is that the district court committed reversible error by admitting the IRS memorandum into evidence as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B). We agree, and we hold that the memorandum should have been excluded regardless of whether it was offered for the truth of the matters asserted therein or merely for the more limited purpose of rehabilitating the in-court testimony of Agent Wallwork of the Internal Revenue Service.

For nearly 200 years last past, the courts have enforced, except in certain very limited circumstances, a general prohibition against the use of prior consistent statements. While it is true that the use of such statements to prove the truth of the matters asserted has always been clearly barred by the hearsay rule, *see, e. g.*, 4 Wigmore, Evidence § 1132, at 294 (Chadbourn rev. 1972); 6 Wigmore, Evidence § 1792, at 327 (Chadbourn rev. 1976),[4] the courts have also generally prohibited the use of such evidence even when the proponent of the prior consistent statement was simply offering it for the more limited purpose of bolstering the witness's damaged credibility. *United States v. Check*, 582 F.2d 668, 677 n. 27 (2d Cir. 1978); *Mitchell v. American Export Isbrandtsen Lines, Inc.*, 430 F.2d 1023, 1029 (2d Cir. 1970); *United States v. Lev*, 276 F.2d 605, 608 (2d Cir.), *cert. denied*, 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); 6 Wigmore, Evidence § 1792, at 327 (Chadbourn rev. 1976) ("Consistent statements to *corroborate* a witness are admitted in cer-

tain cases only.") (emphasis in original). The rationale for excluding most, but not all, prior consistent statements being offered to establish the witness's credibility is one of relevancy. "The witness is not helped by [the prior consistent statement;] even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it." 4 Wigmore, Evidence § 1124, at 255 (Chadbourn rev. 1972); *see* 4 Wigmore, Evidence § 1122, at 254 (Chadbourn rev. 1972). There have been situations, however, in which courts traditionally have felt that it is indeed relevant to the issue of whether the witness's in-court testimony should be believed that on prior occasions the witness has uttered statements which are consistent with his in-court testimony. "Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive." Note to Rule 801, Notes of the Advisory Committee on the Proposed Rules of Evidence [hereinafter "Advisory Committee Notes"], 56 F.R.D. 183, 296 (1972); *accord, United States v. Check, supra*, 582 F.2d at 680–681; *see, e. g.*, 4 Wigmore, Evidence § 1128, at 268 (Chadbourn rev. 1972); 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01]. But the prior consistent statements have been so admissible only when the statements were made prior to the time the supposed motive to falsify arose. *United States v. Check, supra*, at 681; *United States v. Fayette*, 388 F.2d 728, 733 (2d Cir. 1968); *United States v. Grunewald*, 233 F.2d 556, 566 (2d Cir. 1956), *rev'd on other grounds*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *People v. Davis*, 44 N.Y.2d 269, 405 N.Y.S.2d 428, 376 N.E.2d 901 (1978); 4 Weinstein's Evidence

---

4. § 1792. *Witness' statements used in impeachment.* The utterances of a witness indicating *bias* are receivable to impeach him (§ 950 *supra*) on the principles noted in the preceding section. Statements offered as *self-contradictions* are admitted not as assertions to be credited, but merely as constituting an inconsistency which indicates the witness to be in error in one or the other statement; their use as hearsay assertions is uniformly prohibited by the courts (§ 1018 *supra*). Such an apparently inconsistent state-

ment may be explained away by other utterances (§ 1044 *supra*). Consistent statements to *corroborate* a witness are admitted in certain cases only, but are never conceded to have any testimonial force (§ 1132 *supra*). In all of the foregoing instances the utterance is used otherwise than as an assertion to be credited, and therefore the hearsay rule is not applicable.

6 Wigmore, Evidence § 1792, at 326–27 (Chadbourn rev. 1976).

¶ 801(d)(1)(B)[01]; J. McLaughlin, "New York Trial Practice," 179 N.Y.L.J. No. 111, June 9, 1978, at pg. 1, col. 1, pg. 2, col. 4–5. Only then was the prior consistent statement "relevant" on the issue of credibility; that is, it tended to make the trustworthiness of the witness's in-court testimony more probable, after that testimony had been assailed, inasmuch as the consistency of the prior statement with the witness's testimony at trial made it "appear that the statement in the form now uttered was independent of the [alleged] discrediting influence." 4 Wigmore, Evidence § 1128, at 268 (Chadbourn rev. 1972).

To the extent that a prior consistent statement is used for rehabilitative purposes, the Federal Rules of Evidence have apparently not altered prior law. Fed.R. Evid. 402 laconically states that "[e]vidence which is not relevant is not admissible," and "relevant" evidence is defined in Fed.R. Evid. 401 as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Needless to say, irrelevant evidence is evidence which does not possess such a tendency. While credibility is always an issue of consequence and while "testimony which aids in the jury's determination of a [witness's] credibility and veracity [is always relevant]," *Lewis v. Baker,* 526 F.2d 470, 475 (2d Cir. 1975), it is well-recognized, as we have already explained, that only some well-defined classes of prior consistent statements can really so assist the jury. Therefore, it has been only those particular categories of prior consistent statements which have been able to withstand the objection that the prior consistent statement is irrelevant to the issue of the witness's credibility.

█ In one very significant respect, though, the Federal Rules of Evidence, through the adoption of Fed.R.Evid. 801(d)(1)(B), have altered the preexisting evidentiary law on the use of prior consistent statements. Fed.R.Evid. 801(d)(1)(B) provides, in pertinent part:

(d) *Statements which are not hearsay.* A statement is not hearsay if—

(1) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . ..

As can be seen, Fed.R.Evid. 801(d)(1)(B) does not, in and of itself, purport to allow the introduction of any prior consistent statements, but it does insure that any prior consistent statement which satisfies its requirements will not be regarded as "hearsay" and thus inadmissible under Fed.R. Evid. 802. In other words, prior consistent statements which satisfy the conditions set forth in Fed.R.Evid. 801(d)(1)(B) can now be used, in contrast to the restricted permissible uses under preexisting law, as "substantive evidence," Note to Rule 801, Advisory Committee Notes, *supra,* 56 F.R.D. at 296, to prove the truth of the matters asserted therein. *E. g., United States v. Check,* 582 F.2d at 680–681. It is of greatest importance, however, that, inasmuch as the drafters of the proposed Federal Rules of Evidence intended that prior consistent statements could be used as substantive evidence only in those "situations in which rehabilitation through consistency would formerly have been allowed," 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01], at 801–100; *accord, United States v. Check, supra,* at 680–681. Note to Rule 801, Advisory Committee Notes, *supra,* 56 F.R.D. at 296, the standards for determining whether prior consistent statements can now be admitted as substantive evidence are precisely the same as the traditional standards and, as explained above, continue to be the standards used under the new rules of evidence for determining which varieties of prior consistent statements can be admitted for the more limited purpose of rehabilitation.

█ It is clear, therefore, that to avoid having the prior consistent statement found

irrelevant under Fed.R.Evid. 402 or incapable of satisfying the requirements of Fed.R.Evid. 801(d)(1)(B), the proponent must demonstrate three things. First, he must show that the prior consistent statement is "consistent with [the witness's in-court] testimony." Fed.R.Evid. 801(d)(1)(B). Second, the party offering the prior consistent statement must establish that the statement is being "offered to rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive." *Id.* Finally, it is necessary that, as was the situation under the law of evidence prior to the adoption of the Federal Rules of Evidence, *see, e. g., United States v. Check, supra,* at 680–681; *United States v. Fayette, supra,* 388 F.2d at 733; *United States v. Grunewald, supra,* 233 F.2d at 566, the proponent must demonstrate that the prior consistent statement was made prior to the time that the supposed motive to falsify arose, *e. g., United States v. Check, supra,* 582 F.2d at 681; *United States v. McGrath,* 558 F.2d 1102, 1107 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Lombardi,* 550 F.2d 827, 828–29 (2d Cir. 1977) (per curiam); 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01].

Here, during oral argument before us, in response to pointed questioning from the bench the government has failed to satisfy this third requirement. The various improper motives [5] the defense vigorously asserted the IRS agent might have had for lying on the witness stand—motives reducible essentially to a claim that, regardless of Quinto's actual guilt or innocence, throughout the entire investigation the government agents were ruthlessly seeking a conviction, presumably to enhance their own professional advancement and aggrandizement—would have been as operative at the time the IRS agents compiled the memorandum summarizing their interview with Quinto as those motives were at the time the IRS agents testified at trial. Indeed, Quinto's testimony attempted to show that the "interview" had been more in the nature of a trap and an inquisition and that, even at the time of the interview, the IRS agents and the prosecutors were, in common parlance, out "to get" him. Thus, the deeply rooted prejudice which Quinto claims was motivating the agents' actions existed both at the time the memorandum was compiled and at the time of Quinto's trial.

Moreover, while the admissibility of the memorandum was being debated at trial, at no time during his extended remarks on the subject did the prosecutor apparently point out to Judge Pratt exactly what improper motives might have existed at trial that did not also exist at the time of the compilation of the memorandum. Indeed, restricting his argument advocating the document's admission to the ground that there had been "a general attack on the agent's credibility," indeed, a "broad based attack on motive, intent, integrity of not only this agent, but the Internal Revenue Service in the preparation and prosecution of this case," the prosecutor seemingly thought the memorandum admissible regardless of the time when the alleged motive to falsify might have arisen. Judge Pratt also mistakenly assumed that, regardless of the time when any motive to falsify might have arisen, the memorandum was admissible as soon as there had been a clear "challenge to [the agent's] credibility, even [in] the form of a contradiction," Tr. at 347, or "contradictory testimony by someone else," *id.* Although the district judge refused to admit the document during the redirect examination of Agent Wallwork, he did permit it to be introduced after Wallwork's testimony had been "contradicted" by Quinto and several other witnesses. The judge's apparent reasons for allowing the document to be admitted are not, and historically have not been, a sufficient basis for admitting prior consistent statements for rehabilitative purposes.

A former consistent statement helps in no respect to remove such discredit as

---

5. The prosecutor did not claim that Agent Wallwork's testimony was being attacked as a "recent fabrication," *see* Tr. at 346, but instead claimed that the testimony was being assailed on the ground that it was based on "improper motive, bias," *id.*

may arise from a contradiction by other witnesses., When B is produced to swear to the contrary of what A has asserted on the stand, it cannot help us, in deciding between them, to know that A has asserted the same thing many times previously. If that were an argument, then the witness who had repeated his story to the greatest number of people would be the most credible.

4 Wigmore, Evidence § 1127, at 267 (Chadbourn rev. 1972); *accord, e. g., United States v. Adams,* 385 F.2d 548, 550 n. 3 (2d Cir. 1967) (Friendly, *J.*) ("prior consistent statements . . . would have been equally incompetent after impeachment which here was solely by contradiction"); *Mitchell v. American Export Isbrandtsen Lines, Inc., supra,* 430 F.2d at 1029 (prior consistent statement to bolster witness's testimony inadmissible "even after the witness whose testimony is sought to be bolstered has been contradicted"); *United States v. Leggett,* 312 F.2d 566, 572–73 (4th Cir. 1962), *cert. denied,* 377 U.S. 955, 84 S.Ct. 1633, 12 L.Ed.2d 499 (1964); *see People v. Williams,* 403 N.Y.S.2d 548 (2d Dep't 1978).

 We therefore conclude that the memorandum was irrelevant for the rehabilitative purpose of bolstering Agent Wallwork's challenged credibility and, to the extent that it was used or could be used as substantive evidence to prove the truth of the matters asserted in the memorandum, it did not satisfy the requirements of Fed.R. Evid. 801(d)(1)(B) and it therefore was not excluded from the definition of hearsay contained in Fed.R.Evid. 801(c). As a consequence, it was inadmissible under Fed.R. Evid. 802 unless it could satisfy the standards of one of the hearsay exceptions delineated in Rules 803 and 804 of the Federal Rules of Evidence. This it could not do, for "in criminal cases reports of public agencies setting forth matters observed by police officers and other law enforcement personnel . . . cannot satisfy the standards of any hearsay exception if those reports are sought to be introduced against the accused." *United States v. Oates,* 560 F.2d 45, 84 (2d Cir. 1977); *United States v. Ruffin,* 575 F.2d 346, 356 (2d Cir. 1978). We

therefore hold that the district court erred in admitting the IRS memorandum against Quinto.

 Having concluded that the memorandum was improperly admitted into evidence, we must now determine whether the error necessitates reversal of the convictions. We do not hesitate to decide that it does. The test for determining whether error not of constitutional dimension is prejudicial error, is, of course, a familiar one. Regardless of whether there were other independently sufficient evidence to convict the defendant, we can find the error harmless only if "our conviction is sure that the error did not influence the jury or had but very slight effect," *United States v. Ruffin, supra,* 575 F.2d at 359, quoting *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *accord, United States v. Check, supra,* 582 F.2d at 684–685; *United States v. Frank,* 494 F.2d 145, 161 n. 19 (2d Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974). Here it is a virtual certainty that the eight-page single-spaced IRS report substantially influenced the jury to convict Quinto. The more official and authoritative a writing appears to be, the less likely it is that even cautious or cynical individuals will be able to resist the temptation to regard the accuracy of the contents of the document as being beyond reproach. The memorandum which the IRS agents prepared following their interview with Quinto is, to say the least, impressive in appearance. Indeed, the specificity with which the document relates the entire course of the interview, the questions propounded by the interrogators and Quinto's responses to those inquiries, leads us to believe that it would indeed be the unusual juror who would be unimpressed and uninfluenced by the memorandum or who would be at all dubious that Quinto had been treated solicitously or that he actually had confessed that he was "trying to screw the government out of some cash if [he] could." In fact, we have little doubt that once the jury had retired to the privacy of their deliberations, the document which we have held to have been

improperly admitted probably became the single most important piece of evidence, testimonial or documentary, against Quinto, for "[t]he jury thus had before it a neat condensation of the government's whole case against the defendant. The government's witnesses in effect accompanied the jury into the jury room. In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but very slight effect." *United States v. Ware,* 247 F.2d 698, 700–01 (7th Cir. 1957); *accord, United States v. Brown,* 451 F.2d 1231, 1233–34 (5th Cir. 1971); *Sanchez v. United States,* 293 F.2d 260, 267–70 (8th Cir. 1961); *see United States v. Frattini,* 501 F.2d 1234, 1235–36 (2d Cir. 1974); *see also United States v. Adams, supra,* 385 F.2d at 550–51 (Friendly, *J.*). Moreover, the error is not rendered harmless by the fact that IRS "agents had testified and were cross-examined on the same subjects." *United States v. Adams, supra,* 385 F.2d at 551 (interpreting *Ware* and *Sanchez* ); accord, *United States v. Ware, supra,* 247 F.2d at 700–01; *United States v. Brown, supra,* 451 F.2d at 1234. Finally, this was a case in which, on both the tax evasion and false swearing charges, the issue of paramount importance was whether the defendant had acted with willful intent. Of course, if the jury believed that Quinto had really stated that his purpose in not reporting income had been "to screw the government out of some cash," Quinto, for all practical purposes, could not possibly have hoped for acquittals on any of the charges. Although Wallwork testified that Quinto had made such a crucial admission, the jury might not have credited the agent's in-court testimony. It is difficult for us to believe, however, that the jury could have ignored the elaborate IRS memorandum which was improperly introduced into evidence and, unfortunately for Quinto, this document was all the jury really needed to see to conclude

that Quinto had indeed acted willfully in violating the Internal Revenue laws.

Judgment order reversed and case remanded for a new trial on all counts of the indictment.[6]

6. Having concluded as we do that Quinto's convictions must be reversed, we have no occasion to consider either the claim that the prosecutor made improper and prejudicial remarks during his summation or the contention that Judge Pratt's method of designating alternate jurors was improper. Moreover, inasmuch as we are reversing all convictions we need not here resolve a Quinto contention that the two convictions on the false subscribing counts should have been struck off and the sentences thereon vacated on the ground that these two crimes are lesser-included offenses within the greater offenses of tax evasion.