**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Karl Anthony YOUNGER, Defendant and Appellant.**

**No. 16671.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 1990.

Decided April 4, 1990.

Wade A. Hubbard, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen. (on brief), Pierre, for plaintiff and appellee.

Jeff Larson, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

An indictment was filed November 17, 1988, charging Karl Anthony Younger (Younger) and Franklin Edward Harris, Jr. (Harris) with first degree rape, in violation of SDCL 22–22–1(1).

On March 14, 1989, Harris entered into a plea agreement wherein his charge was reduced to first degree attempted rape in exchange for his testimony against Younger. Younger's trial jury was impaneled on March 14, 1989. The jury found him "guilty" and Younger was sentenced to serve fifteen years in the state penitentiary. We note that the attorney who represented Younger on appeal was not Younger's trial counsel. On appeal Younger argues:

(1) That the trial court erred in denying his motion for mistrial in response to a witness' confused testimony regarding another witness' statement;

(2) That the trial court erred in admitting into evidence the complaining witness' statement to her daughter;

(3) That the trial court erred in denying his motion for mistrial, in reaction to questioning of a witness regarding his response to an investigation request;

(4) That the trial court erred in ruling regarding language of the indictment in that the indictment cited plural offenses within a single count or in that jury instructions deviated from the indictment;

(5) That the trial court erred in denying his motion for a new trial based upon a spectator's actions.

–Holding–

We affirm Younger's conviction.

## FACTS

On the evening of October 12, 1988, Kathleen Kenley (Kenley) and her boyfriend Jeff Burnett (Burnett) went to the Rainbow Bar in Sioux Falls. Later in the evening, Kenley and Burnett went to the Frontier Bar which is just across the parking lot from the Rainbow.

At the Frontier, the couple observed Younger and Harris. Kenley and Burnett decided to depart the Frontier at approximately 1 p.m. Kenley recalls little of her trip home because she was intoxicated and tired. According to the most consistent testimony, Kenley, Harris, and a woman known as "Fran" got into Kenley's car, a red Honda CRX, to go home.

During the trip home, a white, two-door foreign car followed them. In spite of Kenley's efforts to elude the white car, it stayed with them consistently. As Kenley pulled up in front of her house, the white car "cut" in front of the Honda. Apparently, Younger "jumped out" of the white car and pulled Kenley from her automobile. A neighbor with a view of Kenley's residence witnessed the commotion and promptly called the police.

After Younger pulled Kenley from the car, he removed her keys from the car's ignition, opened the door to Kenley's home, and took her inside. Harris and "Fran" got out of the car and followed them inside.

By Kenley's testimony, she got a drink of water and then lay down to sleep on her couch, when she next realized a male seizing her. As she tried to get away, her assailant slammed her into the wall. Younger called Harris to help him with her. At that point, Kenley knew that Harris was one of the attackers. A third man fled.

The two assailants, Younger and Harris, took Kenley into her living room. At that

point, she recognized Younger and Harris by the dining room's light.

According to Kenley's testimony, Younger pulled off her shoes, jeans, and underwear and then raped her. Younger threatened to cut Kenley's eyes out so she could not identify him. He said he would cut her breasts off, mail them to her and then threatened to kill her.

During the attack, Harris had left the house by the back door to get a pack of cigarettes. When he returned, he saw Younger and his victim. Kenley was "on the floor balled up" and looked "like a wild person." Seeing Harris, Younger demanded the keys to Kenley's automobile and subsequently drove off in the Honda.

In Younger's absence, Harris attempted to have sex with Kenley. She hit and kicked him. After Harris' aborted attack was over, Kenley attempted to use the telephone calling 911. As Harris stood in the front doorway of the house, he saw Kenley's red Honda return, observed that it did not stop, and then witnessed the arrival of the police. Harris pointed at the car and said, "that's the car." The officers, Officer Blades and Boschee, drove off and pulled over the red car. In that car, were Karl Younger and his sister, Barbara Younger. Barbara testified that Younger came to her house in the middle of the night saying someone was being raped and they had to help.

Blades stopped his patrol car behind the Honda after Younger and his sister drove around the corner by Kenley's home. Barbara Younger exited the automobile and began talking to Blades, saying that Harris was raping someone. After Younger exited the passenger side of the car, the officers noted that he appeared to be "nervous, apprehensive and somewhat disoriented." Younger confessed to Blades that he had been "speeding." Boschee called for another patrol car to go to Kenley's residence. Then the officers released Younger and his sister.

Officer Allan Phillips responded to Boschee's call to investigate the scene. Phillips went to the front door, knocked and observed a woman sitting inside the house.

When she did not respond, Phillips entered and identified himself. The woman appeared "hysterical and frightened" and she was clad only in a white blouse. After Phillips gave her a blanket, he noticed the phone receiver was off the hook. He picked it up and found the police department dispatcher at the other end of the line. After Officers Blades and Boschee arrived at the house, Blades saw a pair of blue jeans turned inside out and entwined in a pair of panties lying in front of a couch in the living room. While Phillips and Boschee examined the house, they found "Fran" sleeping on the floor behind the furnace in the basement.

After their release, Younger and Barbara Younger went to April Reimers' residence, Kenley's daughter. The two knocked on the window and said that Reimers' mother was in trouble. Reimers called her mother and Officer Blades answered. Blades asked to talk to Younger, but Barbara Younger took the call instead.

Reimers drove herself to her mother's residence while Paul Dysart, Reimers' boyfriend, drove Kenley's Honda, taking Younger home. Reimers entered the house and saw her mother crying in a "hysterical manner." After Reimers noticed that the house was in disarray, Kenley told her daughter that she did not remember what happened and refused to divulge her rapists' names.

Officer Boschee took Kenley to the hospital. Her account of the rape was that she had been assaulted by five males. She also told Dr. Anthony Javurek of the McKennan Hospital Emergency Department that she had been held down and sexually assaulted by five individuals. During his examination, Dr. Javurek found that she had many tender spots, including her vagina. He observed injuries to her face that were "consistent with being struck with a hand" and bruises that apparently were caused by fingers gripping her arms forcefully. It was the doctor's opinion that Kenley had experienced recent sexual penetration and had been assaulted, an assault that was consistent with the attack she described to him.

April Reimers met with her mother the following morning. During a conversation, Kenley told Reimers that she knew who raped her, but that out of fear she had not divulged her assailants' names. She reported that Younger, Harris, and a third person had been present but that the third individual didn't participate. Asking her daughter not to tell anyone, Kenley related how Younger had threatened her and how frightened she was of him. Kenley confessed that she was not sure that Harris had committed rape.

Officer Thompson spoke to Kenley that day also. She confessed to him that Younger, Harris and possibly a third individual had raped her. Three days later, she again admitted that she had driven herself home and again stated that she had been raped by Younger and Harris.

## DECISION

I. *The trial court did not err in denying Younger's Motion for Mistrial in response to a witness' confused testimony regarding another witness' statement.*

Younger argues that Officer Blades' testimony concerning Barbara Younger's statement denied him a fair trial. Officer Blades had two conversations with Younger's sister, Barbara. During the first conversation, she told Blades that Harris had raped Kenley. She made a comment during the second conversation that Karl admitted to her some involvement in the rape. Officer Blades referred to the second conversation while being questioned about the first:

CASEY: What did she say about the incident?

BLADES: Said that, I think Frank Harris had raped a girl.

CASEY: Okay. Did she in fact tell you that somebody had raped a girl at that house?

BLADES: Yes.

CASEY: Did she say anything about Karl?

BLADES: Yes.

CASEY: What did she say?

BLADES: Her exact words?

CASEY: Well, as well as you can remember.

BLADES: She said, Karl ended up rapin' her.

CASEY: Your Honor, I'm going to object.

Defense counsel timely moved for a mistrial, which was denied. During the discussion of the motion, the prosecutor admitted that he was surprised by the answer and Officer Blades admitted to the misstatement. The Judge subsequently admonished the jury.

 The decision to grant or deny a mistrial must be based on the prejudicial affect of the witness' statement. *State v. Farley*, 290 N.W.2d 491 (S.D.1980). The trial court has wide discretion in determining the prejudicial effect of a witness' statements, and it is only when this discretion is clearly abused that this court will overturn a decision. *Id.* "Prejudicial error," for purposes of determining whether error constitutes grounds for mistrial, is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of party assigning it. *State v. Michalek*, 407 N.W.2d 815 (S.D.1987). SDCL 23A–44–14 defines harmless error as "[a]ny error, defect, irregularity or variance which does not affect substantial right[s]." The harmless error rule governs even constitutional violations, not requiring the automatic reversal of a conviction, provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained. *State v. Heumiller*, 317 N.W.2d 126, 130 (S.D.1982) *citing Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the court followed *Chapman* and framed the question a reviewing court must ask as follows: "Absent (the alleged error) ... is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?"

 Despite Officer Blades' misstatement, we are satisfied that Younger had a

fair trial. The objection to the answer was sustained, and at the request of defense counsel, a specific admonition was given to the jury that the officer's answer was erroneous and should be disregarded. The same officer's testimony was further impeached in other areas during cross-examination due to a lack of clear recollection. Later during the case, defendant's sister, Barbara Younger, testified without objection that she did not make the statement in question. Her testimony on that point was not impeached by the state. Finally, the strength of the evidence against Younger from other witnesses in the case renders the officer's error in testimony harmless. Therefore, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. Accordingly, the trial court did not abuse its discretion in denying the motion for mistrial.

II. *Even though the trial court erred in admitting into evidence the complaining witness' statement to her daughter, her testimony is deemed cumulative and not prejudicial.*

Elicited from Reimers on direct examination was a statement that her mother made the day after the attack. This statement identified her attackers as Harris and Younger over defense counsel's objection. At trial, the state argued that the victim's statement to her daughter was an "excited utterance." The trial court found the statement too far removed from the event to qualify as such. The state, however, presented an alternative argument in favor of admission of Ms. Kenley's statement under the "prior consistent statement rule." The trial judge allowed the statement to be presented to the jury without providing specific legal rationale.

■ South Dakota maintains the "prior consistent statement" rule of evidence. SDCL 19–16–2 (Rule 801(d)(1)). South Dakota's premier case on point is *State v. Thompson*, 379 N.W.2d 295 (S.D.1985). It outlines three requisites for application of the rule which was argued by the state on appeal:

Before a prior consistent statement will qualify as nonhearsay under the rule, the proponent must demonstrate three things. First, he must show the prior consistent statement is consistent with the witness' in court testimony. Second, he must establish that the statement is being used to rebut an express or implied charge against the witness of recent fabrication or improper motive or influence. Finally, the proponent must demonstrate that the prior consistent statement was made prior to the time the supposed motive to falsify arose [citation to *United States v. Quinto*, 582 F.2d 224 (2nd Cir.1978)].

■ Although the present case clearly meets the first two *Quinto* requirements, it does not fulfill the third requirement as set forth. Thus, the trial court erred in admitting April Reimers' testimony concerning her mother's statement.

■ Even though the ruling was erroneous, Reimers' testimony was merely cumulative to all other testimony at trial. In *State v. Fender*, 358 N.W.2d 248 (S.D.1984) we expressed: "We also note that when evidence admitted at trial is cumulative only and other admissible evidence supports conviction, the cumulative evidence though inadmissible is not prejudicial." *Id.* at 254. Kenley's hearsay statement to Reimers was no different than Kenley's testimony to the jury. Therefore, we do not recognize Reimers' testimony as being prejudicial.

III. *The trial court did not err in denying Younger's Motion for Mistrial due to the state's questioning of Barbara Younger regarding Younger's response to an investigation request.*

■ Younger's sister, Barbara, testified that a detective had contacted her in an attempt to get in touch with Younger to get him to go to the police station. The prosecutor followed that testimony with:

BINGER: But Karl never did go in, did he?

BARBARA: No.

Defense counsel immediately objected. The court admonished the jury not to give any attention to the statement since the question was asked and answered. De-

fense counsel reserved a right to make a motion and later moved for a mistrial, saying the question by the state was highly improper and a violation of his client's constitutional right against self-incrimination. Defense counsel further submits the inference obviously was that because his client may not have contacted the police department, reflected an indication of his guilt. The trial court denied the motion for mistrial, saying that under the circumstances, the question was not prejudicial to the extent that a mistrial should be declared. We agree. Clearly, the trial judge had his own analysis of the prejudicial effect of the testimony and the curative effect regarding his admonishment to the jury. He is, of course, in a superior position from which to judge any incident's impact on a jury. *State v. Kidd,* 286 N.W.2d 120, 122 (S.D. 1979).

IV. *The trial court did not err in its rulings with respect to the wording of the indictment.*

A. The indictment did not cite plural offenses within a single count; and

B. The jury instructions did not deviate from the indictment.

■ This Court has adopted a primary rule regarding the sufficiency of an indictment (or information). "The information must state all the elements of the crime with sufficient particularity so as to apprise the defendant of the crime charged to enable him to prepare an adequate defense and plead the judgment as a bar to a subsequent prosecution for the same offense." *State v. Heisinger,* 252 N.W.2d 899, 905 (S.D.1977). A fair and reasonable opportunity to build one's defense is the clear basis for this court rule.

■ This Court has provided a test for application of the *Heisinger* requirement. [T]he test for the sufficiency of an indictment is whether it is designated in such a manner as to enable a person of common understanding to know what was intended. SDCL 23A–6–7(5). It must contain the elements of the offense charged so as to inform the defendant of the charge against him and enable him to plead an acquittal of conviction in bar of future prosecutions for the same offense. An indictment is generally sufficient if it employs the language of the statute or its equivalent.

*State v. Logue,* 372 N.W.2d 151, 155 (S.D. 1985). The test, like the rule, does not mandate absolute precision, but does require that a defendant have a fair chance to repel the charges against him.

■ In the instant case, it was obvious from the inception of the case that Younger and the State were referring to "one act of sexual penetration," even though the indictment was worded as *"acts* of sexual penetration." It is clear by the manner in which the State and Younger presented their cases that Younger was charged with an *act* not *acts.* Granted, the indictment is not an example of excellent pleading, but it was sufficient to give notice of the crime charged.

Younger also argues that the wording of the indictment does not correspond precisely to the jury instruction which outlined the elements of the offense. The relationship between indictments and instructions is addressed in *State v. Lachowitzer,* 314 N.W.2d 307, 309 (S.D.1982). The court stated:

In any event, even if the indictment failed to allege all the essential elements of the crime charged, it does set forth the statutes which defendant violated and the trial court instructed the jury on all of the essential elements of the crime and all the essential elements were proven at trial. This is sufficient to correct the indictment if it was defective. *State v. Larson,* 294 N.W.2d 801 (S.D.1980); *State v. Guiliano,* 270 N.W.2d 33 (S.D. 1978).

If a legally sound jury instruction can cure omissions of an element from an information, it surely overcomes such an insignificant variation as "acts" versus "act."

V. *The trial court did not err in denying Younger's Motion for New Trial based upon a bystander's communication with the jury.*

The court in *State v. Stewart,* 278 S.C. 296, 295 S.E.2d 627 (1982) provides us with

an appropriate legal analysis on this final issue:

The right to a fair trial by an impartial jury in a criminal prosecution is guaranteed by the Sixth Amendment to the U.S. Constitution ... while this right does not require a 'perfect' trial, the very heart of a 'fair trial' embodies a disciplined courtroom wherein an accused's fate is determined solely through the exercise of calm and informed judgment.

Ideal conditions, it is true, are not to be expected, and verdicts should not be set aside by an appellate court for misconduct in a trial, unless the evidence is clear and convincing that extraneous influences so interfered with the conduct of the trial, or so pressed upon the jury, as to become factors in the result.

In the instant case, no such "clear and convincing" evidence exists. The spectator was an acquaintance of Younger. Both Younger and his acquaintance were black. Apparently, this acquaintance glared at the jurors. The demonstrative antics, obviously, did not sway the jury's verdict. The spectator's conduct, giving the jurors "the evil eye," did not "arise to the point of being prejudicial error." Glaring at the jury is improper but does not reach reversible error.

Further, no objection was made by defense counsel during trial. Younger admits that error. The motion first appeared at a hearing ten days after the conclusion of the trial. Though Younger eventually did move for a mistrial, his motion to the trial court was tardy and he cannot claim error now.

Conviction and sentence affirmed.

MORGAN and MILLER, JJ., concur.

WUEST, C.J., and SABERS, J., concur specially.

WUEST, Chief Justice (concurring specially).

I concur in the majority opinion, except as to the harmless error standard enunciated therein, i.e., "the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained." I believe the standard expressed in my writing in *State v. Davis*, 401 N.W.2d 721 (S.D.1987) is the better rule. Under either standard, the judgment must be affirmed and I so vote.

SABERS, Justice (concurring specially).

I generally concur with the majority opinion, but I am concerned with the treatment in Section II of hearsay evidence as harmless error. The opinion states:

Even though the ruling was erroneous, Reimers' testimony was merely cumulative to all other testimony at trial. In *State v. Fender*, 358 N.W.2d 248 (S.D. 1984) we expressed: "We also note that when evidence admitted at trial is cumulative only and other admissible evidence supports conviction, the cumulative evidence though inadmissible is not prejudicial." *Id.* at 254. Kenley's hearsay statement to Reimers was no different than Kenley's testimony to the jury. Therefore, we do not recognize Reimers' testimony as being prejudicial.

I have two concerns with this paragraph: 1) it too casually concludes that the admission of evidence was harmless because it was cumulative; and 2) the challenged testimony was not simply for purposes of identification, but also bolstered the credibility of the victim.

1. My first concern stems from the majority opinion's approach to the problem that seems to shift the analysis from one which considers the effect the error had on the verdict to considering the sufficiency of the evidence properly admitted. As a result, the analysis applied to the problem is incomplete. The Wisconsin Supreme Court has clearly expressed my concern in this regard in its opinion in *State v. Billings*, 110 Wis.2d 661, 329 N.W.2d 192 (1983). In that case, the court was faced with an appeal by a defendant who claimed that evidence had been improperly admitted at trial. The state argued that if the evidence was improperly admitted, it was duplicative of properly admitted evidence, thus the error was harmless. The court explained the inquiry it must make in such a situation:

Courts must make an inquiry into the nature of all of the evidence that the jury heard to assess whether an error in admitting certain evidence was harmless beyond a reasonable doubt. The impact of the erroneously admitted evidence on the jurors cannot be assessed either by looking at the erroneously admitted evidence in isolation or by looking at the evidence unaffected by the error (hereafter referred to as "untainted evidence") in isolation to determine whether it is sufficient to support the conviction. The court cannot, as the United States Supreme Court has admonished, give too much emphasis to "overwhelming evidence" of guilt. *Chapman* [*v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 710 (1967)]. Emphasizing the sufficiency of untainted evidence independently of the erroneously admitted evidence creates a danger of substituting the court's judgment for the jury's. Rather, the court must inquire whether on the basis of all the evidence there is a "reasonable possibility" that the constitutional error "might have contributed to the conviction."

*Id.* at 195. When the basis for claiming harmless error is that the evidence is cumulative, a court's inquiry must ask more than whether duplicative evidence exists:

A court's inquiry as to harmlessness does not end with its determination that the erroneously admitted evidence duplicates the untainted evidence. Regardless of the duplicative nature of the erroneously admitted evidence, the record in the particular case might reveal that the admission of the evidence was or was not prejudicial. In some cases the jury may not have been persuaded of the defendant's guilt had it not been presented with the erroneously admitted duplicative evidence. Conversely, in other cases although the erroneously admitted evidence is not duplicative, it could be clear to the court that the evidence had no impact on the conviction.

*Id.* at 196. In summary, the majority opinion's error is that it fails to consider the impact of the erroneously admitted evidence on the jury's verdict. Would the jury have been convinced of Younger's guilt without the hearsay testimony?

2. My second concern flows from the first. By failing to consider the impact of the erroneously admitted evidence, the majority opinion focuses only upon the challenged testimony as identification testimony. However, this improperly admitted testimony had a greater impact and was more than mere identification. The primary effect of the testimony was to bolster the credibility of the victim. The testimony of a victim's daughter that her mother broke down and told her who committed the crime is powerful evidence to present to a jury. The question we must ask is what impact did the admission of that testimony have upon the jury's verdict. Can we say beyond a reasonable doubt that the jury would have returned the same verdict if they had not heard that testimony? In fact, such analysis was employed by this court in *Fender, supra*. The quote from *Fender* as used by the majority oversimplifies the analysis that opinion requires. The *Fender* court affirmed the admission of the challenged evidence because it was obvious to the court that the evidence "did not contribute to the jury's verdict." *Id.* at 254.