8139.

STATE v. WELDON.

NEW TRIAL—TRIAL.—Where counsel appointed by the Court to defend
prisoners charged with an atrocious murder on the way to the place
of trial hears threats among a large crowd on the streets of lynching,
and on this account and of the overbearing attitude of the crowd
in the courtroom gave up his right to ask for three days to prepare
the case for trial, and during the trial the courtroom was so filled
with people hostile to the prisoners as actually to fill up the bar
around the prisoners, counsel and jury, so that the counsel could not
at times see the witnesses being examined, and counsel for the
prisoners could not see the jury until he addressed them from the
crowd, a new trial will be granted.

Before PRINCE, J., Florence, October, 1911.  Reversed.

Indictment against Alex. Weldon and William Borroughs for murder. The report of special Judge George Brown, who tried the case, is:

"The entire appeal record having been referred to me as the trial Judge in the above stated case, by an order of the Supreme Court for a full report upon 'all the matters alleged in the affidavits and exceptions,' to the end that I certify to said Court a 'statement of all the conditions surrounding the trial so far as they are germane to the exceptions quoted' in said order 'and the matters alleged in the affidavits appearing in the record,' I beg leave to 'report' and 'certify' that I went from Darlington to Florence on the day of the trial on the car by morning train, arriving on or about schedule time, 8:30 or 9 o'clock a. m., and Court convened at 10 o'clock a. m.

"There was a large crowd in Florence during the day and when this is stated all is stated which I know which could excite even casual interest except that an atrocious assassination of a worthy citizen had been committed and that the parties charged with the crime were there and then to be tried and the presence of the crowd was supposedly due to these facts. The presence of such a crowd under these circumstances was natural and proper and was no surprise to me. I saw very many there personally known to me to be of the best citizenship of the county and of its most law abiding and patriotic personnel. Why that crowd is denominated a mob I do not know. It certainly manifested no mob spirit to my eye or within my hearing. It was just simply a crowd and quite a crowd for Florence court room and that is all that can be said about it except 'that it was the best behaved crowd I ever saw,' and I am here quoting in effect my own words when defendants' motion for a new trial was overruled. It did crowd within the bar, of which fact I was not unobservant, but to say that it was in possession of the courthouse and held the same during the trial is a gross misconception of the conditions as I saw them. I had a right to

assume and did assume that the presence of that crowd was for a lawful purpose not only consistent with the best citizenship, but composed, as it was, in support of law and order. It was certainly wholly lacking in any element of a riotous assemblage and in no respect was it disorderly; and in this regard, as I am expected to make 'a full report,' it is proper that I should particularize by saying that I saw no evidence of drunkenness (or even evidence of drinking) in the crowd and it was in all respects quiet and well behaved. An individual instance of boisterousness or bad conduct did not come within my observation during the term. In every instance when I observed that it was becoming too much crowded within the bar or my attention was called to such conditions my admonitions received the most respectful consideration and obedience, and there was never any crowding within the bar that in any way interfered with the orderly dispatch of the business of the Court or with the rights of counsel or the accused.

"If the jury was overawed, intimidated or put in fear I am at a loss to know what did it. No member of the jury made any complaint before, during or since the trial to me; the sheriff was there and he likewise made no complaint. I went to and from the courthouse unattended and I have yet to see or hear of any threats or overawing conditions. There was no military in attendance and none suggested, though there is an excellent company in Florence, one in Darlington and another in Timmonsville, each only ten miles distant.

"Counsel for defense did not request the three days and copy of the indictment to which he was entitled on demand, and such demand would most certainly have been granted without any apprehension of danger to counsel or defendants. If there was anything improper or irregular in this trial I do not know it, and as long as the statute stands for the speedy trial of criminal offenses at special terms, I doubt

if there will ever be in this State a more quiet and less sensational trial.

"Defendants were ably defended, and the result of the trial is due to the weight which the jury gave to the testimony, which is their exclusive province."

The following affidavits were submitted by the appellants:

"Personally appeared W. F. Clayton, who, being sworn, says that he was preparing to go to the Kingstree Court, which was then in session, he having several equity cases before that court, when J. A. Muldrow, clerk of the court for Florence county, then assembled as a special Court to try Alex. Weldon and William Burroughs and under a separate indictment one Ham for the murder of Elihu Moye, informed deponent that the special Judge wanted to see him; deponent went to the Court and the special Judge informed him that he wanted an experienced lawyer to defend Alex. Weldon and William Burroughs, they having no counsel; that deponent stated he would defend them; that when deponent entered into the court room he found a crowd occupying every available space in the court room; that on the streets was an unusual crowd for that city; that he heard expressions in regard to lynching of the parties accused of the killing of Moye; that when he entered the court room it was all he could do to push his way through the crowd. Every seat was taken up, the isles were full, and the bar reserved for the lawyers was full. That under conditions surrounding, deponent did not dare to ask for his three days as by law he was entitled to, believing as he did, that then and there his clients would have been murdered; deponent knew nothing of his defense, but went into it, without knowledge and under the testimony, as the only testimony against them was the testimony of Ham. That after the testimony was taken and he had made his argument, deponent left the court room, overcome by the fumes of the crowd, but asked the Judge to protect the rights of the accused, which he promised to do. That during the

trial of the case deponent did not see the jury until he addressed them, from the crowd intervening; that on several occasions deponent requested the Judge to compel the sheriff to clear away the crowd that he might see the witness whom he was examining. That deponent left the court-house after he had made his argument. That while at supper at his home deponent was informed that the jury had brought in a verdict of guilty as to his clients. That deponent immediately repaired to the Court and with difficulty forced an entrance from the crowd, and found the Judge about to pass sentence. That deponent immediately moved for a new trial, which was argued and overruled, and as deponent left the courthouse he heard several voices say, it is a good thing a new trial was not granted, as if said new trial had been granted the prisoners would not have got back to jail alive.                    W. F. CLAYTON."

Sworn to.

"Personally appeared Lucien W. McLemore, who, being sworn, says that on the evening after the jury rendered a verdict of conviction in the case of the State against Alex. Weldon and William Burroughs and on the morning following deponent heard on the streets of Florence repeatedly that if W. F. Clayton, Esq., had secured a verdict of acquittal for these defendants both the negroes and their attorney would have been lynched.

Sworn to.                    LUCIEN W. McLEMORE."

"Personally appeared R. Lee Brunson, who, being sworn, says: That the day the defendants were tried in Florence, there was an immense crowd on the streets; that he went to the courthouse, and found the same full, bar, passage, and every available space; that he obtained a position on a barrel just behind the Judge's seat overlooking him; that he distinctly recollects hearing Mr. Clayton, who was conducting the defense, request the Judge to order the sheriff to clear away the crowd so that he could see the witness

whom he was examining, or words to that effect; that never in his experience has he seen such a crowd in the courthouse.

Sworn to.                                        R. LEE BRUNSON."

"Personally appeared D. Gordon Baker, who, being sworn, says: An atrocious murder had been perpetrated in Florence county, a worthy citizen had been shot down in his own house, excitement was intense, a special term of Court was ordered, an immense crowd came to Florence, on the day of the trial; that on the day of the trial as an attorney practicing before the Court, he went to the rear entrance, to the bar reserved for the lawyers, staid there only a short time as the crowd was so dense and the respiration bad, and left believing that the jury was overawed by the crowd.

D. GORDON BAKER."

The letter of F. F. Covington, stenographer 12th Circuit, who, being in Court, stated that he wished it considered that this letter was sworn to, is:

"Marion, S. C., April 17, 1911.
"W. F. Clayton, Florence, S. C.    Dear Mr. Clayton:

"Thanks for brief and points and authorities in Weldon and Burroughs case; I hope you will win out; you have made a strong showing.    If the Supreme Court could have witnessed that trial as you and I saw it, I don't think they could fail to find a reason for granting a new trial.    True that crowd that packed the court room was smiling and good natured, but it was because things were going their way.    There was blood lust in their hearts, and if there had been a hitch in the proceedings which indicated that they would be balked of their prey, the demon of the mob would have uttered a howl that would have been heard all over the State, and two lifeless bodies, and it may be more, would have been borne out of that court room.

Yours very truly,    F. F. COVINGTON."

From motion refusing new trial defendants appeal.

*Messrs. W. F. Clayton* and *Willcox & Willcox,* for appellants.

*Solicitor Walter H. Wells,* contra.

March 16, 1912. The opinion of the Court was delivered by

MR. JUSTICE WOODS. The appellants, Alexander Weldon and William Burroughs, were convicted of the murder of Elihu Moye, and are under sentence of death. By a former appeal, the defendants sought a new trial in this Court on the ground that they had not had a fair trial, without having made a motion in the Court of General Sessions on that ground; but the appeal was dismissed as premature, without prejudice to the right of the defendants to move for a new trial in the Circuit Court. The orders of this Court and the disposition of the appeal appear in 88 S. C. 555, and 89 S. C. 308.

After the dismissal of the former appeal a motion was made in the Court of General Sessions for a new trial on the grounds, first, that the defendants had discovered evidence in their favor after their trial which they should be allowed to offer, and second, that the trial was not fair and impartial. The motion was refused, and this appeal brings up for review both questions made in the Court below.

The affidavits as to the after discovered evidence fall short of making out a defense so clear and convincing as to warrant this Court in holding that the Circuit Judge abused his discretion in not granting a new trial on the first ground.

The second ground of appeal—the averment that the defendants have been convicted and sentenced to death without a fair and impartial trial—brings up for decision an issue of vital concern to every citizen of the State. By our Constitution the people have set the law above themselves, except as they choose to change it by the methods which

they themselves have ordained; and they have laid upon the
Courts the duty of enforcing their promise that the weak as
well as the strong shall be condemned only after a fair trial
according to law before an impartial jury.    In the faithful
performance of their promise by the people, and in the dis-
charge of their duty by the Courts is involved not only the
public honor, but public safety, prosperity, and happiness;
for in the long run neither individual nor community suc-
cess is possible unless men feel that they will not lose life
nor liberty nor property without a fair and impartial trial
under the law of the land.    Therefore the complaint of the
defendants that a large and hostile crowd of persons so
interfered with the trial that it was not a fair trial, con-
cerns not only the defendants, but all the people.

Ideal conditions it is true are not to be expected, and
verdicts should not be set aside by an appellate court for
misconduct in a trial, unless the evidence is clear and con-
vincing that extraneous influences so interfered with the
conduct of the trial, or so pressed upon the jury, as to
become factors in the result.    A vast number of cases might
be cited to show that this Court will refuse to heed unsub-
stantial charges that trials have not been fair.    Yet in all
the course of the development of the administration of law
in England and America there has never been a doubt of
the rule laid down in 1819 in the case of the *King* v. *Hunt
et al.,* 2 Chitty 130, when the Court said it, is of the
greatest importance that the administration of justice should
be free, not only from spot or blame, but that it should be,
as far as human infirmity could allow it to become, as free
from all suspicion.

The special Judge, Hon. George W. Brown, who presided
at the trial has certified that according to the facts as they
appeared to him the rights of the defendant were safe-
guarded and the trial properly conducted.    His opinion and
that of Judge Prince, who denied the motion for a new
trial, are entitled to great consideration; for their ability

and their solicitude that the defendants should have a fair trial cannot be doubted. In passing upon the correctness of their conclusions of law every statement of fact made by the trial Judge will be taken as true; and the evidence offered on behalf of the defendants will be taken as true only in so far as it is consistent with the statement of fact found in the report of the trial Judge.

Looking at the case in this way we find these to be the material facts: An atrocious murder of a worthy citizen had properly aroused the interest and indignation of the entire community. One of the persons suspected had confessed, and implicated as active participants in the crime the two defendants. Very soon after the murder a special term of Court had been ordered to try both the confessed murderer and these defendants. An immense number of people assembled at the trial intensely hostile to the accused, and crowded the courthouse. The defendants being without counsel, the presiding Judge sent for Mr. W. F. Clayton and requested him to undertake their defense. On his way to the Court through the dense crowd Mr. Clayton "heard expressions in regard to lynching," which convinced him that if he should ask for the three days of preparation allowed by law, the prisoners would be lynched, and under the compulsion of this fear he gave up that most vital right, and went immediately into the trial without preparation. That the danger of mob violence was present and imminent is made further manifest by the statements of Mr. Lucien W. McLemore and the stenographer of the Court, Mr. F. F. Covington, both witnesses of high character. Not a particle of evidence was offered by the State to controvert this showing. The presiding Judge, it is true, says that the crowd was quiet, and that it manifested no mob spirit to his eye nor in his hearing, but this statement does not impair the force of the testimony of those who mingled with the people and thus had better opportunity to observe. Thus it appears, beyond all doubt, that the circumstances of the trial

were such that counsel of experience and courage gave up under the most urgent compulsion the right to three days of preparation guaranteed to the accused by the law, and that, too, when he had been called into the case by the Court without previous notice.

Compulsion is sufficient to annul a will or a contract for the sale of property. How then can it be held that a trial involving life or death was fair and impartial according to the law of the land when the accused, under the compulsion of a reasonable apprehension of lawless violence, surrenders a right vital to his defense?

In an opinion delivered by the distinguished Judge Elliott, the Supreme Court of Indiana under circumstances very similar to those appearing here set aside for compulsion a plea of guilty, which defendant's counsel showed to the Court had been entered by their advice on the reasonable apprehension that if their client should be acquitted he would be lynched. *Sanders* v. *State,* 85 Ind. 318, 44 Am. Rep. 29.

It is argued, however, that counsel should have sought the protection of the Court. No doubt, that course would have been the most judicious, but, in view of the surroundings, and especially in view of the fact that the Judge's seat was itself pressed upon by the crowd, it would be an unjust judgment to hold that the accused lost a vital right by the failure of their counsel to do the most judicious thing in the sudden emergency which he was called on by the Court to meet.

Consideration of the further proceedings deepens the conviction that the trial was not fair. With respect to the charge that the space within the bar immediately around the Judge, the jury, and the witnesses was so taken by the great crowd, that the trial could not proceed with decorum and fairness, the presiding Judge says that it was the best behaved crowd he ever saw and that there was nothing to indicate to him a sign of a riotous spirit, that it did crowd within the bar, but that it was not in possession of the court-

house.  He says further: "In every instance when I
observed that it was becoming too much crowded within the
bar or my attention was called to such conditions my admo-
nitions received the most respectful consideration and obedi-
ence, and there was never any crowding within the bar that
in anyway interfered with the orderly dispatch of the busi-
ness of the Court or with the rights of the counsel of the
accused." The affidavit of Mr. Clayton contains the fol-
lowing statement: "That during the trial of the case depo-
nent did not see the jury until he addressed them from the
crowd intervening, that on several occasions deponent
requested the Judge to compel the sheriff to clear away the
crowd that he might see the witness whom he was examin-
ing." There is no statement of fact made by the presiding
Judge inconsistent with the statement of Mr. Clayton.  It
thus appears that a large number of persons hostile to
defendants were allowed so to press upon the Court that
counsel for the defense had to ask several times that they
be cleared away so that he could see the witness under
examination, and so to press around the jury that counsel
could not see them until he stood before them to argue the
case.  We are unable to assent to the opinion of the presid-
ing Judge that such a state of affairs did not interfere with
the orderly conduct of the business of the Court or with the
rights of the accused.  Trials must be public, but the right
of the accused to a fair trial is superior to the right of the
public to witness the trial.  In all trials not only the dignity
and decorum which should characterize the administration
of justice, but the preservation of the rights of the people
and of the parties to the cause, require that the public should
be kept away from the witnesses and the jury and the coun-
sel, to the end that the issue may be tried and decided with-
out interference or extraneous influence.  In this case the
public was not so kept away.  On the contrary, a large num-
ber of persons justly indignant at an atrocious murder, and

undeniably hostile to the accused, pressed upon the Court, the jury, and the witnesses.

Clearing away the hostile crowd from time to time did not meet the case. Fairness required that at least the space between the accused and their counsel, the jury, and the witnesses should have been kept free from intrusion. Courts cannot control public sentiment, but their commission from the people is to keep the inviolable precincts of the prisoner's dock, the counsel's place, the witness chair, the jury's seats, and the intervening space free from either hostile or friendly invasion or intrusion, lest the accused be terrified or his counsel confused in making his defense, lest the witness testify falsely under fear of inducement, lest the jury be overawed, or their minds influenced by an atmosphere surcharged with hostility or partiality. The intrusion into these inviolable precincts of a large number of persons, part of a vast assemblage hostile to the prisoners, was calculated to terrify the defendants, to confuse their counsel, to intimidate the witnesses, and to overawe the jury. This, with the fact that counsel gave up the right of the accused to have three days to prepare for their trial under the compulsion of a reasonable apprehension that the assertion of the right would result in their death by lynching, compels the conclusion that the defendants did not have a fair and impartial trial.

Applying the law more specifically, we reach these conclusions: The conditions under which counsel conducted the defendants' cause, and under which their witnesses were examined substantially interfered with the due exercise of the right granted by section 49 of the Criminal Code, "that the accused shall, at his trial, be allowed to be heard by counsel, may defend himself, and shall have a right to produce witnesses and proofs in his favor, and to meet the witnesses produced against him face to face."

The jury was not so safeguarded against extraneous influences as to allow the defendants the right of trial by an

impartial jury, guaranteed by section 18, article I of the Constitution; and the defendants were, by the compulsion of the fear of death by lynching, deprived of the right to have three days to prepare for their trial, conferred on them by section 40 of the Criminal Code.

Under varying facts other Courts have with practical unanimity held that verdicts should not be allowed to stand where action by those in attendance on a trial was calculated to overawe or influence the jury, or substantially interfere with the rights vital to the parties. *Hamilton* v. *State* (Tex.), 37 S. W. 431; *Westfolk* v. *State* (Ga.), 8. S. E. 724; *Raines* v. *State* (Miss.), 33 Sou. 19; *Sanders* v. *State,* 85 Ind. 318, 44 Am. Rep. 29; *People* v. *McMahan* (Ill.), 91 N. E. 104; *Doyle* v. *Commonwealth* (Va.), 40 S. E. 925; *State* v. *Wilcox* (N. C.), 42 S. E. 536; *Robinson* v. *State* (Ga.), 65 S. E. 792.

The judgment of this Court is that the judgment of the Circuit Court be reversed, and the cause remanded for a new trial.

MESSRS. CHIEF JUSTICE GARY *and* JUSTICE HYDRICK *alone participate in this opinion and concur.*