21656

The STATE, Respondent, v. Angela Z. STEWART, Appellant.
(295 S. E. (2d) 627)

---

*Marshall B. Williams, Charles H. Williams* and *Karen L. Williams*, all of *Williams & Williams*, Orangeburg, and *Henry Hammer*, of *Hammer & Bernstein*, Columbia, *for appellant.*

*Atty. Gen. Daniel R. McLeod, Sr. Asst. Atty. Gen. Brian P. Gibbes* and *Asst. Atty. Gen. Lindy P. Funkhouser*, Columbia, *Sol. Norman E. Fogle* and *Asst. Sol. Joseph P. Mizzell*, Orangeburg, and *I. S. Leevy Johnson*, Colubmia, *for respondent.*

March 3, 1982.

LITTLEJOHN, Associate Justice:

A jury found defendant Angela Z. Stewart guilty of the murder of her husband, Paul A. Stewart, and she was sentenced to life imprisonment. She appeals.

On April 13, 1980, Paul A. Stewart was found dead in bed at his Orangeburg residence with five .38 calibre bullets in his body. The entire house, including the bedroom, appeared undisturbed. No property was reported missing. However, there was a broken window pane in a side door and a rock was lodged between the broken pane and the door curtain. The broken pane provided access to the inside door knob and lock. Fingerprint smudges found on the door knob were not identifiable.

The death was reported by Mrs. Stewart about 12:00 midnight. The pathologist who performed an autopsy on the body of the deceased testified that the time of death was approximately 8:00 p.m.

On August 20, 1980, Mrs. Stewart was charged with murder. In her statement given to the police officer the night of the killing and in her testimony at trial, she consistently maintained that she was not at home when her husband was killed. Her account is generally as follows:

> (1) She and her daughter left the residence in a blue pickup around 8:30 p.m. for Columbia, about 40 miles away, to retrieve a repaired motorbike belonging to Mrs. Stewart's son and to return the daughter to her apartment in Columbia;

(2) When they left home, Mr. Stewart was lying in bed watching television;

(3) Upon returning home around midnight, she discovered his bleeding body and immediately telephoned for an ambulance; and

(4) She called for assistance from Melvina McDonald, a tenant residing in a nearby apartment owned by the Stewarts, and from Lewis Pinkston, McDonald's boyfriend, both of whom were talking outside the nearby apartment.

The boyfriend of Mrs. Stewart's daughter testified that the repaired motorbike was at his apartment in Columbia and that Mrs. Stewart and her daughter arrived between 9:30 and 10:00 p.m. and placed the motorbike in the blue pickup.

In its prosecution, the State relied exclusively upon circumstantial evidence, the most crucial parts being as follows:

(1) The bullets removed from the deceased's body matched a bullet fired by defendant from her husband's pistol at a snake two years earlier in a friend's backyard;

(2) The pathologist testified that Mr. Stewart died from the bullet wounds around 8:00 p.m.;

(3) Lewis Pinkston testified that the Stewart's blue pickup was at the house from 9:30 until 10:00 p.m., during which time Mrs. Stewart states she was driving it to Columbia;

(4) Mr. Stewart had quarreled with Mrs. Stewart and her daughter two days prior to the killing concerning how the daughter parked in the driveway; and

(5) Lewis Pinkston's testimony conflicted with that of Mrs. Stewart as to events occurring that evening after Mrs. Stewart requested the help of Pinkston and his girlfriend.

Besides the testimony of Mrs. Stewart and accompanying corroboration, her defense presented testimony by attorney Luke Brown (presently circuit court judge), a close friend with both Mr. and Mrs. Stewart. He testified that in 1976 he helped Mrs. Stewart purchase a .38 calibre pistol for Mr. Stewart after Mr. Stewart had expressed to Mr. Brown his desire for a handgun. Additionally, he testified that Mr. Stewart reported

in 1978 that the gun had been stolen from his car. A nearby service station owner and his wife testified that they heard five shots around 10:30 p.m., thus discrediting the medical testimony placing the shooting at 8:00 p.m. Though this information was reported to investigating police officers the day after the killing, it was not revealed to the defense by the Solicitor's Office until the morning of trial.[1] Defense sought to cast suspicion upon Lewis Pinkston by questioning his activities the night of the killing and by pointing out conflicts between his testimony and that of his girlfriend, Melvina McDonald, and of Mrs. Stewart. Finally, several witnesses testified that the Stewart's enjoyed an apparent happy marriage.

On appeal, the defendant argues (1) that the trial judge erred in not granting her motion for directed verdict or motion for judgment n.o.v. for lack of sufficient evidence; (2) that the whole of the atmosphere surrounding and attending the trial was pervasive and hostile to the defendant and denied her a fair trial in violation of due process rights; (3) that the trial judge erred in not granting defendant's request for continuance based upon suppression of exculpatory material (i.e., testimony of service station owner and his wife); and (4) that the trial judge erred in failing to give a curative instruction to the jury to disregard a portion of the State's closing argument.

■ Where the State relies exclusively upon circumstantial evidence in a criminal case, motion for directed verdict must be determined in light of whether the evidence constitutes positive proof of facts and circumstances which reasonably tends to prove the guilt of the accused, or from which guilt may be fairly and logically deduced, to the exclusion of any other reasonable hypothesis. The evidence must be viewed most favorably to the State. *State v. Hudson,* 284 S. E. (2d) 773 (S. C. 1981).

■ In directing a verdict, the trial judge in effect tells the jury, "You must believe certain evidence because there is no reason to discredit it (i.e., no evidence to the

---

[1] As authorized in *Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194, 10 L.Ed. (2d) 215 (1963), defense counsel had earlier filed a motion requesting the Solicitor to disclose any exculpatory information.

contrary)." Here it was for the jury to determine whether testimony of Mrs. Stewart or of the witness who testified to the contrary was true. While the jury might have believed her testimony, they were not required as a matter of law to do so. We find no error by the trial judge in denying defendant's motions of directed verdict and for judgment n.o.v.

Defendant next asserts that happenings at trial served to render it inherently unfair. Among these were an overcrowded courtroom with outburst from spectators and an improper gesture from a spectator to the jury.

The record shows that spectators filled the courtroom seats to capacity and even stood against the walls.

While the fact that spectators were allowed to overflow the seating capacity and stand in the courtroom would not normally be grounds for a new trial, it is the better practice to limit the audience to those who can be seated. An overcrowded courtroom tends to create an improper atmosphere and is not conducive to calm deliberations by the jury. The trial judge insisted more than once that spectators refrain from sitting on the row next to the jury box. After several outbursts of laughter from the spectators, the trial judge issued the following admonition:

> ... Now, this is not a show, it's not a public spectacle and any outbursts of laughter or exclamation of any kind from anyone who is in the courtroom observing these proceedings is completely and absolutely out of order and we should not have it and I cannot permit it. So, please, regardless of what's being asked or regardless of what's being answered do not make any outbursts of laughter. Nobody is trying to be funny in this situation. This is a most serious situation and the charges against the defendant and the defendant's rights are to be respected by you as well as by everybody else. So we cannot have that anymore. Do not do that.

During a recess in the trial, the forelady of the jury reported to the trial judge that one spectator continually glared at the jury with "obvious disgust" and that the same person had earlier made several opinionated remarks overheard by some jurors prior to being sworn. That person had left the courtroom when the complaint was made. Based upon this

report, counsel for the defense moved for a mistrial, arguing, "... that the jury has been duly—and unduly prejudiced and that we cannot receive a fair trial." The seriousness of the problem is indicated by the statement of the judge in overruling the motion:

All right. Well, of course, what I think was said to me this morning by the Sled Agent was that the foreman did not want to make any particular personal charge out of the matter against the spectator, whoever the spectator might have been. Let me say this to start off with, directing my attention to your motion for a mistrial, I have to overrule that. But I think it is a matter that should be taken up, and I think it's a matter of considerable seriousness because this, this is a serious matter, and I talked to the spectators in the courtroom along those lines yesterday after several outbursts of laughter which I did not approve of and I do not approve of under any circumstances. The Foreman—the Forelady—did say that prior to the jury being chosen it was someone who was a spectator who stated in a voice that could be overheard by many of the prospective jurors before they were chosen an opinion concerning the guilt or innocence of the defendant. I have told the jury to disregard that and I think they understand that they, that has absolutely no bearing on anything that they do in this trial ...

And it would be well if the spectators would understand that they are not to interfere with the jury by glaring at the jury, glances or faces or anything else. I—I don't know what it was, but I don't want to have to undertake to, to discipline any spectator in a matter of this serious nature, because it is disruptive to the procedure. So I would suggest to the spectators that they avoid looking at the jury panel and look at the attorneys and the witnesses because that of course is the main part of the trial.

■ We think it was an error for the trial judge to overrule the motion for a mistrial without having first explored the improper conduct of the spectator and without having first determined whether or not there was prejudice. Language found in *State v. Salters*, 273 S. C. 501, 257 S. E. (2d) 502 (1979), wherein the defendant's rights were potentially

affected prejudically by newspaper articles printed during his trial, applies equally to this case.

In the instant case, the trial judge did not take the initial step of ascertaining whether the articles were prejudicial. In effect, the court held that no matter what the articles said or how prejudicial they may be, it was bound to presume that the jury had followed its instructions. Under the circumstances of this case, the sole reliance by the trial judge on his admonition was insufficient to assure the appellants a fair trial . . .

We conclude that when the articles were brought to the court's attention, as these were by the attorneys, the court should have made a determination as to whether the information was in fact prejudical so as to measure the "extent of the infection", [sic]. . . .; and, we accordingly hold that where, as here, the articles contained prejudicial matter, is [sic] was imperative that the trial judge inquire as to whether any of the jurors had seen the articles, and if they had, to invoke the appropriate curative measures. Due to the trial court's failure to observe these precautionary measures, we are compelled to reverse and remand this case for a new trial.

The right to a fair trial by an impartial jury in a criminal prosecution is guaranteed by the Sixth Amendment to the U. S. Constitution and by Article I, § 14, of the S. C. Constitution. While this right does not require a "perfect" trial, the very heart of a "fair trial" embodies a disciplined courtroom wherein an accused's fate is determined solely through the exercise of calm and informed judgment.

Ideal conditions, it is true, are not to be expected, and verdicts should not be set aside by an appellate court for misconduct in a trial, unless the evidence is clear and convincing that extraneous influences so interfered with the conduct of the trial, or so pressed upon the jury, as to become factors in the result. *State v. Weldon*, 91 S. C. 29, 74 S. E. 43 (1912).

It is the duty of the trial judge to see that the integrity of his court is not obstructed by any person or persons whatsoever. *Shearer v. DeShon*, 240 S. C. 472, 126 S. E.

(2d) 514 (1962); 75 Am. Jur. (2d) *Trial* § 40 (1974). His exercise of this duty will not be disturbed absent an abuse of discretion.

The State admits that the trial judge admonished the spectators on several occasions, but contends that admonitions are routinely made during the course of a typical trial. We disagree. It is true that a trial judge must occasionally instruct courtroom bystanders as to expected proper conduct. Rarely, however, are we faced with situations involving an over-crowded and noisy courtroom requiring several admonitions. These conditions clearly interfered with the conduct of the trial.

The sole reliance by the trial judge on his instructions to the jury to disregard improper spectator conduct and on his several admonitions to the courtroom in general was insufficient to assure defendant a fair trial. Denial of this right requires a new trial.

The necessity of a new trial renders moot the remaining two exceptions [1] *Brady* violation and [2] improper closing argument).

Having concluded that defendant was denied her right to a fair trial, we reverse the verdict and remand for a new trial.

Reversed and Remanded.

LEWIS, C. J., GREGORY and HARWELL, JJ., concur.

NESS, J., concurs and dissents.

NESS, Associate Justice (concurring and dissenting);

I concur in the majority opinion that prejudicial error was committed at trial. I also believe the evidence is insufficient to support the conviction. I would reverse and order a judgment of acquittal.

The *crucial issue* presented by the motion for a directed verdict is whether the deceased, Paul Stewart, was shot and killed at 8:00 p.m. on the evening of the homicide. It is undisputed that his wife, the appellant, was at home at that time.

The State concedes its case rests solely on circumstantial evidence, the crucially disputed essential circumstance is whether the victim was shot and killed at 8:00 p.m. If this

circumstance were established by competent proof it would be proper to submit the issue of appellant's guilt to the jury. On the other hand, if this proof was based on surmise, conjecture and speculation, the evidence would be insufficient and erroneous to submit the case to the jury.

The primary testimony relied on by the State to establish the time of death at 8:00 p.m. was the testimony of Dr. Sandra Conradi, a forensic pathologist.

On direct examination, Dr. Conradi testified she examined the body of the deceased at 12:00 noon on the day following the homicide, and *estimated* that death had occurred between twelve and twenty-four hours earlier, with sixteen hours as a good *estimate*, thus speculating that the death occurred at 8:00 p.m. Her testimony was, (Tr. 195 ff. 13-25);

Q. And could you tell us in your medical opinion how long the body had been dead?

A. I estimated the body had been dead between twelve and twenty-four hours with sixteen hours as a good estimate in my opinion as to the length of time.

Q. So from 12:00 o'clock when you examined the body, you said sixteen hours before that?

A. Yes, sir.

On cross examination, Dr. Conradi testified: Tr. 203 f. 15, Tr. 204 f. 4:

Q. Now, you have narrowed down, you said, that you examined him at 12:00 o'clock, is that correct?

A. Yes, sir.

Q. The following day?

A. Yes, sir.

Q. And you said the cause of death was somewhere between twelve and twenty-four hours?

A. Yes, sir.

Q. And when you say sixteen is that because you are taking the middle? The average?

A. Oh, sixteen, sixteen would be in my opinion a good estimate as to the time, a little closer to the twelve than the twenty-four.

Q. Could it vary as much as—could it vary sixteen hours either way?

A. *It could*, but in my opinion it *may vary two hours* either way. (emphasis added)

From a review of this testimony, it is obvious that the conclusion reached by Dr. Conradi as to the time of death was based purely upon surmise, conjecture and speculation. This proof offered by the State to establish the time of death at 8:00 p.m. is insufficient to support the conviction.

We have uniformly held where the State relies *solely* upon circumstantial evidence to support a conviction, *as it does here*, "it is necessary that every circumstance be proved beyond a reasonable doubt .... It is not sufficient that they create a probability, though a strong one," and, "on a motion for a directed verdict the trial judge ... should not refuse to grant the motion where the evidence merely raises a suspicion of guilt." *State v. Littlejohn*, 228 S. C. 324, 89 S. E. (2d) 924 (1955); *State v. Jones*, 241 S. C. 271, 128 S. E. (2d) 114 (1962).

Reviewing this evidence in the light most favorable to the State as required by the "any" evidence rule, *State v. Bailey*, 253 S. C. 204, 170 S. E. (2d) 376 (1969), I am convinced that the record is without "any" evidence to support appellant's conviction.

Moreover, viewing the evidence in accordance with the standard of appellate review mandated by the United States Supreme Court in *Jackson v. Virginia*, 443 U. S. 307, 99 S. Ct. 2781, 61 L.Ed. (2d) 560 (1979), it is even more convincing the trial judge erred in refusing appellant's motion for a directed verdict. This standard of appellate review requires us to consider not whether there is "any" evidence to support the conviction, but whether viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt.

It is inconceivable that a rational trier of fact could justify a finding of guilt beyond a reasonable doubt based upon the evidence of record, because of the following:

1. The speculative nature of Dr. Conradi's testimony relating to the crucial issue as to the time of death;
2. The testimony relating to the broken window pane through which anyone could gain entrance into the home by unlocking the door;
3. The testimony of the impartial witness, Syphrett, that he heard five gunshots at 10:15 p.m., conclusively rebut-

ting the speculative conclusion by Dr. Conradi as to the time of death;

4. The strange activity of the State's witness, Pinkston, on the evening of the homicide, that angry remarks were directed to Pinkston's girlfriend by the deceased for messing up the yard;

5. The testimony concerning car doors slamming in the victim's yard about 10:00 p.m.;

6. The uncontradicted testimony of the three witnesses that appellant was in Columbia about the time the gunshots were heard;

7. The testimony of Judge Brown that the weapon used by the appellant to fire at a snake in the neighbor's yard had been lost by the Stewarts for several years before the homicide;

8. The inability of any witness to verify that the bullet dug up from the neighbor's yard was the same one fired by the appellant at the snake;

9. The testimony that the bullets taken from the victim's body and the matching bullet dug up from the neighbor's yard *could have* been fired from either a .357 Ruger Security 6 or a Manuel Escoden, as well as a .38 caliber.

I would reverse and remand with direction to enter judgment for appellant.