STATE of Utah, Plaintiff and Appellee,

v.

Gale BOONE, Defendant and Appellant.

No. 910046–CA.

Court of Appeals of Utah.

Oct. 18, 1991.

---

R. Paul Van Dam and Marian Decker, Salt Lake City, for plaintiff and appellee.

Ronald J. Yengich, Salt Lake City, for defendant and appellant.

Before BILLINGS Associate P.J., and GREENWOOD and JACKSON, JJ.

## OPINION

BILLINGS, Associate Presiding Judge:

Defendant Gale Boone appeals his conviction for aggravated burglary, a first-degree felony, in violation of Utah Code Ann. § 76-6-203 (Supp.1988).[1] We affirm.

## FACTS

During the evening of January 28, 1989, defendant confronted Steve Carly at the Sandy Station Nightclub and requested that Mr. Carly return a ring Mr. Carly was apparently holding as security for a loan. A fight ensued between the two men, and Mr. Carly agreed to exchange the ring for the loan payment the following evening.

Early the next morning, defendant awakened Mr. and Mrs. Carly by banging loudly upon the front door of their home. When Mr. Carly opened the door, defendant demanded the ring. Although Mr. Carly instructed defendant to wait outside while he went upstairs to get the ring, defendant entered the Carly home. When

Mr. Carly returned with the ring, defendant questioned its authenticity and stated he wanted to resume their earlier fight. Defendant struck Mr. Carly in the mouth with a closed fist, and the two men began fighting. Mr. Carly shouted to his wife to call the police, and he eventually restrained defendant in a headlock.

Two other men subsequently entered the Carly home. One struck Mr. Carly, causing him to hit his head on the kitchen sink. As a result, Mr. Carly became dizzy. Defendant went into the master bedroom, attempting to prevent Mrs. Carly from contacting the police. During the struggle, defendant knocked the Carly's two-year-old child off the bed. While defendant was in the bedroom, Mr. Carly managed to grab three kitchen knives and gesture with them toward his two remaining assailants until they fled. Defendant then exited the home, threatening to kill Mr. Carly's family if Mr. Carly called the police.

The State subsequently charged defendant with aggravated burglary, a first-degree felony, in violation of Utah Code Ann. § 76-6-203 (Supp.1988). Prior to jury deliberation, defendant moved for a mistrial. Defendant alleged Mrs. Carly's disruptive behavior during closing argument prejudiced the jury. The trial court denied the motion, and defendant was convicted.

Defendant moved for a new trial, based again on Mrs. Carly's alleged prejudicial conduct, and for a reduction of the charge to burglary, a second-degree felony, contending there was insufficient evidence to support his conviction of aggravated burglary. The trial court denied both motions, sentencing defendant to a term of five years to life imprisonment, suspended in lieu of a one-year term of incarceration in jail and five years of probation.

On appeal, defendant challenges the trial court's denial of his motions for a mistrial and a new trial. First, he contends Mrs. Carly's disruptive conduct prejudiced the jury, in violation of his constitutional right to a fair trial. Second, he claims there was insufficient evidence to support his convic-

---

1. The current version of the statute under which defendant was convicted, Utah Code Ann. § 76- 6-203 (1990), contains changes which are not material to the issues we consider in this case.

tion of aggravated burglary, as there was no evidence that Mr. Carly suffered bodily injury.

## DISRUPTIVE COURTROOM BEHAVIOR

■ We will uphold the trial court's denial of defendant's motion for a new trial unless we determine the court has abused its discretion. *See State v. Knight,* 734 P.2d 913, 918–19, 923 (Utah 1987); *Anton v. Thomas,* 806 P.2d 744, 747 (Utah App. 1991).

In his motion for a new trial, defendant argued that he was denied his constitutional right to a fair trial[2] because Mrs. Carly's alleged disruptive behavior prejudiced the jury.

Defendant is guaranteed the right to a fair trial by the fifth and fourteenth amendments to the United States Constitution.[3] However, defendant bears the burden of proof in establishing he was denied a fair trial.[4] Therefore, on appeal, defendant must persuade us that Mrs. Carly's courtroom conduct prejudiced the outcome of defendant's trial such that the trial court abused its discretion by denying defendant's motions for a mistrial and for a new trial.

The precise issue of when disruptive courtroom behavior necessitates a new trial has not been considered by Utah's appellate courts. However, the Utah Supreme Court has considered fair trial issues in other contexts, such as the appearance of defendant in prison clothes[5] and pre-trial publicity.[6] The Utah Supreme Court has given trial courts great latitude in preserv-

---

2. Although defendant nominally refers to state constitutional provisions, because he provides no independent state constitutional analysis, we decline to reach his challenge under the state constitution. *See, e.g., State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) ("As a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed."), *aff'd on rehearing,* 776 P.2d 631 (Utah 1989); *State v. Bobo,* 803 P.2d 1268, 1272 (Utah App.1990) ("Until such time as attorneys heed the call of the appellate courts of this state to more fully brief and argue the applicability of the state constitution ... we cannot meaningfully play our part in the judicial laboratory of autonomous state constitutional law development.").

3. *See, e.g., Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment."), *reh'g denied,* 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976); *State v. Pike,* 712 P.2d 277, 279 (Utah 1985) ("Both the Utah and the United States Constitutions guarantee trial by an impartial jury."); *State v. Stewart,* 278 S.C. 296, 295 S.E.2d 627, 631 (right to fair trial "embodies a disciplined courtroom wherein an accused's fate is determined solely through the exercise of calm and informed judgment"), *cert. denied,* 459 U.S. 828, 103 S.Ct. 64, 74 L.Ed.2d 65 (1982).

4. *See, e.g., United States v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956) ("'it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside'"); *State v. Gotschall,* 782

P.2d 459, 463 (Utah 1989) ("The burden of showing error is on the party who seeks to upset the judgment."); *Clegg v. State,* 655 P.2d 1240, 1243 (Wyo.1982) ("The burden to evidence prejudice is on appellant.").

5. *See, e.g., Chess v. Smith,* 617 P.2d 341, 344 (Utah 1980) (defendant appearing in prison clothes creates a "substantial risk of fundamental unfairness in a criminal trial").

6. *See, e.g., State v. Parsons,* 781 P.2d 1275, 1283 (Utah 1989) (presence of prosecutor's father, former district judge, in courtroom did not prejudice trial); *State v. Clark,* 675 P.2d 557, 561 (Utah 1983) ("If the publicity is potentially prejudicial, then the court must question the jurors regarding their exposure and their understanding of it."); *Codianna v. Morris,* 660 P.2d 1101, 1111 (Utah 1983) ("An accused can be denied a fair trial where the process of newsgathering is allowed such a free rein that it intrudes into every aspect of a trial and creates a 'carnival atmosphere' and where the publicity is so weighted against the defendant and so extreme in its impact that members of the jury are encouraged to form strong preconceived views of his guilt."); *State v. Wood,* 648 P.2d 71, 89 (Utah) ("'The mere general showing of publicity thought to be adverse to a party is not sufficient to require a change of venue except in the most extraordinary cases. In the usual situation, the movant must at least make a showing that the allegedly prejudicial material reached the veniremen, so that a foundation is laid for the possibility of actual bias.'"), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Pierre,* 572 P.2d 1338, 1349 (Utah 1977) (publicity sufficient to encourage jurors to form preconceived views of defendant's guilt is an

ing the integrity of the trial process.[7] Generally, problems of extraneous publicity have not been found to require a new trial unless jurors have been actually exposed to such extreme information that the foundation is laid for actual bias. *See State v. Wood,* 648 P.2d 71, 89 (Utah 1981).

Courts from other jurisdictions which have addressed the effects of disruptive courtroom conduct have concluded the defendant bears a heavy burden in seeking a new trial. As the Supreme Court of South Carolina stated: "[V]erdicts should not be set aside by an appellate court for misconduct in a trial, unless the evidence is clear and convincing that extraneous influences so interfered with the conduct of the trial, or so pressed upon the jury, as to become factors in the result." *State v. Stewart,* 278 S.C. 296, 295 S.E.2d 627, 631 (1982) (citation omitted). Some courts require that the jury actually be prejudiced by the conduct.[8] Colorado courts emphasize that "[i]t is only in extraordinary circumstances that a mistrial is necessary to prevent an injustice from resulting because of an extraneous event in the courtroom." *People v. Montgomery,* 743 P.2d 439, 442 (Colo. App.1987).[9] Other jurisdictions have emphasized that a new trial may be unnecessary if the trial judge has properly instructed the jury to disregard the disruption.[10] Finally, most courts trust the discretion of the trial judge to appropriately handle and to determine whether the disorder in the courtroom merits a new trial.[11]

---

"exceptional case"), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

**7.** *See, e.g., Parsons,* 781 P.2d at 1282 (Utah 1989) ("The trial court, with its inherent powers as the authority in charge of the trial, has broad latitude to control and manage the proceedings and preserve the integrity of the trial process.... In fulfilling this role, the trial court is 'responsible for carrying [the trial] forward as efficiently and expeditiously as possible consistent with fairness and thoroughness in administering justice.' ") (quoting in part *Hanks v. Christensen,* 11 Utah 2d 8, 11, 354 P.2d 564, 566 (1960)); *State v. Archuletta,* 28 Utah 2d 255, 501 P.2d 263, 264 (1972) ("it is the responsibility of the trial judge to see that the trial is fairly conducted and he is in the best position to observe such circumstances").

**8.** *See, e.g., People v. Lucero,* 44 Cal.3d 1006, 750 P.2d 1342, 1351, 245 Cal.Rptr. 185, 194 (1988) ("Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict."); *Stewart,* 295 S.E.2d at 631 (1982) (when outside influences "become factors in the result," verdicts must be set aside); *Ashley v. State,* 362 S.W.2d 847, 850 (Tex.Crim. App.1962) (the "probability of injury to the appellant is essential to vitiate the jury's verdict because of the conduct of bystanders. In determining such probability, each case depends on its own environments."), *cert. denied,* 372 U.S. 956, 83 S.Ct. 955, 10 L.Ed.2d 10 (1963).

**9.** *See also People v. Horton,* 683 P.2d 358, 361 (Colo.App.1984) ("[i]n cases of audience misbehavior, a mistrial need be granted only in extraordinary circumstances to prevent an injustice"). In *Horton,* the court found that a spectator's remark which neither the court nor jury members likely heard was "not an extraordinary circumstance which would lead to injustice if a mistrial were not granted." *Id.* at 361.

**10.** *See, e.g., Collins v. State,* 365 So.2d 113, 115 (Ala.Crim.App.) (claim of prejudice refuted by trial judge's polling of jury), *writ denied,* 365 So.2d 116 (Ala.1978); *West v. State,* 146 Ga.App. 120, 245 S.E.2d 478, 479 (1978) (no error when "court thoroughly instructed the jurors to disregard the occurrence and questioned them as to whether they had been influenced thereby"); *Hoffman v. State,* 611 P.2d 267, 271 (Okla.Crim. App.1980) (trial judge dispelled prejudice of victim's brother accusing lawyers of lying by admonishing jury and removing spectator from courtroom); *Commonwealth v. Hawkins,* 448 Pa. 206, 292 A.2d 302, 308 (1972) (judge avoided prejudice by instructing jurors to forget occurrence and "reach their own conclusion"); *Franks v. State,* 541 S.W.2d 955, 956 (Tenn. Crim.App.1976) (trial judge prevented prejudice when mother of victim screamed "the lawyers are liars" by instructing jury to overlook outburst).

**11.** *See, e.g., Messer v. Kemp,* 760 F.2d 1080, 1087 (11th Cir.1985) ("Because the trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst, the decision on whether to grant a mistrial lies within his sound discretion."), *cert. denied,* 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986); *Howard v. State,* 273 Ala. 544, 142 So.2d 685, 687 (1961) (to the trial judge must "be committed matters of discretion which may not be reviewed unless it be made clearly to appear that his discretion has been abused. He should permit no display of any kind which has for its only purpose and result a tendency to prejudice, unlawfully, the minds of the jury"); *Uldric v. State,* 43 Ala.App. 477, 192 So.2d 736, 739 (Ala.Ct.App.) ("It is well settled that in situations such as [courtroom disruptions] much must be left to the sound discretion of the trial judge, he having had the opportunity of seeing and hearing all that tran-

Two cases are particularly helpful in our analysis because of their remarkable factual resemblance to the case before us. In *State v. Domangue*, 350 So.2d 599 (La. 1977), the victim's husband began to weep during defense counsel's closing argument. The trial judge, who was not aware of the crying until it was called to his attention, noted that it was "hardly audible" and unlikely to influence the jury. Nevertheless, the judge instructed the jury to ignore the incident. The appellate court found no abuse of the trial judge's discretion. *See id.* at 602.

A similar result was reached in *State v. Craft*, 85 Ariz. 143, 333 P.2d 728 (1958). Defense counsel argued, in his motion for a new trial, that the mother of the decedent exclaimed within the hearing of the jury, "He killed my baby, he killed my baby." The bystander was quietly removed from court. Defendant's counsel claimed there had been significant commotion in the courtroom which interrupted his closing argument. The trial judge did not hear the remark and did not observe any juror reacting to the remark. The trial court, therefore, denied the motion for a new trial. The Supreme Court of Arizona held the trial judge was in the best position to determine whether the jury was influenced and,

therefore, affirmed the order denying a new trial.[12] *See id.*, 333 P.2d at 730.

■ The record indicates that Mrs. Carly created, at most, a minor disturbance in the courtroom. In support of his motion for a new trial, defense counsel filed an affidavit of a member of the audience, the wife of the attorney for the codefendant, who claimed to have observed Mrs. Carly's behavior. This witness stated:

> While I was at the trial I observed [Mrs. Carly] throwing her hands in the air and saying out loud "that's not true," then getting teary eyed and always trying to make eye contact with the jury. She would shake her head a lot if she didn't agree. This all happened several times a day. She was constantly talking to the officer sitting next to her, saying "that's not true," etc. She was disruptive to me and to people in the courtroom. Whenever she went into all this everyone looked over at her.

> During the trial, whenever anyone came to the door that she knew, she would smile and wave her hand like she hadn't seen them for years.

> She constantly put her head in her hands and started crying (every time they told something about her children or her).

---

spired."), *cert. denied*, 280 Ala. 718, 192 So.2d 739 (Ala.1966); *Hope v. State*, 732 P.2d 905, 908 (Okla.Crim.App.1987) ("the privilege to remove a spectator from the courtroom is clearly within the sound discretion of the trial judge"); *Clegg v. State*, 655 P.2d 1240, 1243 (Wyo.1982) ("Because the trial judge is in an advantageous position from which to gauge the effect on the jury or a witness of a violation of courtroom decorum, he will be allowed considerable latitude in the exercise of his discretion in ruling on a motion for a mistrial for such violation."). This standard harmonizes well with the Utah Supreme Court's deference to the discretion of the trial judge. *See Parsons*, 781 P.2d at 1282; *Archuletta*, 501 P.2d at 264 (1972).

**12.** Defendant relies on several cases in which appellate courts from other jurisdictions have granted a new trial because of disruptive courtroom behavior. *See White v. State*, 25 Ala.App. 323, 146 So. 85 (Ala.Ct.App.1933) (widow dressed in mourning who rose and "cried out in a passionate voice: 'That's not so! That didn't happen!'" so prejudiced the trial that "nothing

[the] learned court could have done would have remedied the harm that had been worked to appellant"); *State v. Gevrez*, 61 Ariz. 296, 148 P.2d 829, 832 (1944) (mother of victim aroused jury sympathy by shouting "Stop it! Stop it! She's not here, she's dead!" and weeping "bitterly"); *Rodriguez v. State*, 433 So.2d 1273, 1276 (Fla.Dist.Ct.App.1983) (widow's "epithets" and "impassioned statements" demonstrating hostility for defendant "necessarily engendered sympathy for her plight"); *Glenn v. State*, 205 Ga. 32, 52 S.E.2d 319, 321 (1949) (widow instructed by prosecutor to "let the jury know she was interested," and who did so by weeping, prejudiced trial); *Price v. State*, 149 Ga.App. 397, 254 S.E.2d 512, 513–14 (1979) (victim's mother's continuous sobbing and outcry of "Oh, my Lord" was "harmful and prejudicial" to defendant's right to fair trial); *Stewart*, 295 S.E.2d at 629–31 (1982) (noisy, overcrowded courtroom with outbursts of laughter and one spectator's glare of "obvious disgust" toward jury interfered with trial). We find these cases factually inapposite. Each involved spectator conduct far more disruptive than is alleged in this case.

During closing argument I observed [Mrs. Carly] throw her arms in the air, shake her head, and say "that's not true"—she would sigh and start to cry and turn to the jury whenever she disagreed. She was disruptive.

The affiant reports that Mrs. Carly's disruptive behavior occurred "several times a day." Both trial counsel and counsel on appeal, however, only challenge conduct allegedly occurring during defense counsel's closing argument. This, undoubtedly, is because Mrs. Carly was only in the courtroom during her own testimony before the jury and closing argument. Both parties had stipulated that witnesses would be excluded from the courtroom.

The trial judge recorded his observations of Mrs. Carly's conduct during closing argument at the conclusion of trial when defendant moved for a mistrial and again at the hearing of defendant's motion for a new trial. The court noted:

As far as eye contact and conduct of any part here, you know, occasionally I saw some of the jurors glance away, but by and large, the jurors were very attentive, by my observation, as to what was being said. I think this is a good jury. They tried to pay attention to the arguments of the attorneys. That was my observation.

I think during the time that the court heard the closing arguments, the court did not observe any actions by [Mrs. Carly] or anyone else in the courtroom. And if I recall correctly, as [defense counsel] was making his closing arguments, the jury was somewhat glued to his closing argument. And I didn't observe any of the jurors' eyes going in any other direction than listening to [defense counsel] and his closing argument.

So I don't know if they observed her raising her hands or heard any statements made by her. I don't recall hearing anything from the audience as far as their statements were concerned, or any eyes, or any gestures made.

Although the trial judge did not personally notice any disturbance in the courtroom, he, nevertheless, instructed the jury to limit their deliberations to the evidence presented during trial and his instructions concerning the law.[13]

We conclude that Mrs. Carly's courtroom behavior did not so interfere with the conduct of the trial as to influence the jury. There is no evidence that any jury members observed the conduct, much less that they were actually prejudiced. Defendant's affiant did not state that any of the jurors were distracted by Mrs. Carly or even noticed her. The trial judge made specific factual findings that he did not observe any disruptive behavior and that he did not see any indication that the jury was distracted. He specifically found the jury was carefully listening to defense counsel's closing argument. Our deference to the trial judge's discretion, *see Parsons,* 781 P.2d at 1282; *Archuletta,* 501 P.2d at 264, is particularly warranted where the record clearly reveals his observations. Furthermore, the court specifically instructed the jurors to be "governed solely by the evidence" and not by "sympathy, passion, prejudice, public opinion or public feeling." This case does not present "extraordinary circumstances" where a new trial is required to prevent manifest injustice. In sum, we conclude the trial court did not abuse its discretion in denying de-

---

**13.** Throughout the trial proceedings, the trial judge admonished the jury to avoid and ignore outside influences. Additionally, the jury was formally charged with Jury Instruction No. 5 which reads, in pertinent part:

The function of the jury is to try the issues of fact that are presented by the allegations in the Information filed in this court and the defendant's plea of "not guilty". This duty you should perform uninfluenced by pity for the defendant or by passion or prejudice against him.... You are to be governed sole-ly by the evidence introduced in this trial and the law as stated to you by me. The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the State of Utah and the defendant have a right to demand and they do demand and expect that you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case, that you will reach a just verdict regardless of what the consequences of such verdict may be.

fendant's motions for a mistrial and a new trial, as we conclude he was afforded a fair trial by an impartial jury.

## INSUFFICIENCY OF EVIDENCE

Next, defendant contends the evidence is insufficient to sustain his conviction for aggravated burglary under Utah Code Ann. § 76–6–203 (Supp.1988).

As a result of his fight with Mr. Carly, defendant asserts that Mr. Carly suffered no "bodily injury," a statutory element of aggravated burglary. Therefore, defendant argues that although he may have committed burglary by unlawfully entering the Carly home, he did not commit aggravated burglary.

Defendant was convicted under Utah Code Ann. § 76–6–203 (Supp.1988) which provides:

(1) A person is guilty of aggravated burglary if in attempting, committing, or fleeing from a burglary, the actor or another participant in the crime:

(a) causes *bodily injury* to any person who is not a participant in the crime;

(b) uses or threatens the immediate use of a dangerous or deadly weapon against any person who is not a participant in the crime; or

(c) is armed with a deadly weapon or possesses or attempts to use any explosive or deadly weapon.

(2) Aggravated burglary is a first degree felony.

(Emphasis added). Utah Code Ann. § 76–1–601(3) (1990) defines "bodily injury" as "physical pain, illness, or any impairment of physical condition."

We must determine whether the State presented sufficient evidence from which the jury could find beyond a reasonable doubt that defendant caused "bodily injury" to Mr. Carly while burglarizing his home. *See State v. Isaacson*, 704 P.2d 555, 557–58 (Utah 1985). This court has limited authority to review a jury verdict challenged on the sufficiency of the evidence. "[W]e view the evidence presented and all inferences that can be drawn therefrom in the light most favorable to the verdict," *State v. Gardner*, 789 P.2d 273, 285 (Utah 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990), reversing "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Petree*, 659 P.2d 443, 444 (Utah 1983). Furthermore, defendant must "marshal all the evidence in support of the trial court's findings and then demonstrate that even viewing it in the light most favorable to the court below, the evidence is insufficient to support the findings." *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *see State v. Sherard*, 818 P.2d 554, 557 n. 1 (Utah App.1991) (citing *State v. Moore*, 802 P.2d 732, 738–39 (Utah App.1990).

Two Utah Supreme Court cases have dealt with the quality of injury required to satisfy the "bodily injury" requirement of § 76–6–203. In *State v. Peterson*, 681 P.2d 1210 (Utah 1984), the defendant was convicted of aggravated burglary after unlawfully entering the victim's home and attempting to choke the victim and her daughter. The victim lapsed in and out of consciousness due to the defendant's chokehold. On appeal, the defendant argued that the small bruises and cuts suffered by the victim and her daughter did not comprise the kind of injury required by the statute.[14] In fact, the court noted that the victim

did not suffer any serious bodily injury; she did not require any medical attention after the assault; she made no claim that any kind of deadly weapon had been used; she did not suffer any permanent disfigurement or protracted loss or impairment of the functions of any bodily

---

14. The *Peterson* court applied a former version of Utah Code Ann. § 76–6–203 which required that the victim sustain "physical injury" rather than "bodily injury." However, the court noted that "[t]he term 'physical injury' is equivalent to the term 'bodily injury,' which is defined as 'physical pain, illness, or any impairment of physical condition.'" *Peterson*, 681 P.2d at 1219.

member or organ; and her bodily injury did not create a substantial risk of death.

*Id.* at 1218–19. The court affirmed his conviction, however, finding that the victim "suffered physical pain that is precisely the type of 'physical injury' contemplated by the statute." *Id.* at 1219. *see also State v. Young,* 559 P.2d 541, 542 (Utah 1977) (requisite physical injury present where defendant's blow to victim's face momentarily stunned victim).

 Defendant attempts to distinguish *Peterson* and *Young* by contending that Mr. Carly sustained no bodily injury at all while he and Mr. Carly fought in the Carly home prior to the entrance of the other two assailants. The record does not support defendant's argument. Mr. Carly testified that after defendant struck him in the mouth with a closed fist, knocking him off balance, he could taste blood inside his mouth. Defendant continued to attack Mr. Carly with his fists such that Mr. Carly was forced to restrain defendant in a headlock. Moreover, Deputy Reed Parkin of the Salt Lake County Sheriff's Office, who investigated the disturbance at the Carly home, testified that Mr. Carly had sustained significant "trauma" to his face. According to Parkin, Mr. Carly's lips were swollen, and there was a pinkish color around his teeth, making it evident that he had been bleeding.[15]

Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found, beyond a reasonable doubt, that defendant caused "bodily injury" to Mr. Carly as contemplated by the statute. Therefore, we affirm defendant's conviction for aggravated burglary.

15. Defendant contends that even if Mr. Carly's dizziness is a statutorily-recognized "bodily injury," he is not liable because another assailant caused the dizziness by pushing Mr. Carly against the kitchen sink. This argument is without merit. Utah Code Ann. § 76–6–203 (Supp. 1988) clearly provides that the injury may be perpetrated by "the actor or another participant in the crime." *Id.* Furthermore, Utah Code

## CONCLUSION

In sum, we affirm defendant's conviction for aggravated burglary. We hold that Mrs. Carly's courtroom behavior did not deny defendant a fair trial. Furthermore, there is sufficient evidence that defendant caused "bodily injury" to uphold his conviction of aggravated burglary under Utah Code Ann. § 76–6–203 (Supp.1988).

GREENWOOD and JACKSON, JJ., concur.

Ann. § 76–2–202 (1990) states: "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct."